IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

SENIOR EXECUTIVES ASSOCIATION
et al.,

      Plaintiffs,

        v.

UNITED STATES OF AMERICA et al.,

      Defendants.

Civil Action No. 8:12-cv-02297-AW

## MEMORANDUM OPINION

    Plaintiffs Senior Executives Association et al. bring this action against Defendants United States of America and Don W. Fox, Acting Director of the Office of Government Ethics. Plaintiffs assert the following claims: (1) violation of the constitutional right to privacy; (2) violation of due process; (3) violation of the Administrative Procedure Act (APA); and (4) declaratory relief. Several motions are outstanding. Of particular importance is Plaintiffs' Motion for Temporary Preliminary Injunction. Doc. No. 19. The Court has carefully reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS** Plaintiffs' Motion for Temporary Preliminary Injunction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

    This case presents a challenge to the Stock Trading on Congressional Knowledge Act of 2012 (STOCK Act), Pub. L. No. 112-105, 126 Stat. 291 (2012). As originally proposed, the STOCK Act (Act) sought to prevent members and employees of Congress from trading on the basis of nonpublic information acquired through such positions. *See* 15 U.S.C. § 78u-1(g)(1). The Act aims to achieve this objective partly through a system of liberal public disclosure of

certain financial information of congressional members and employees. *See, e.g.*, 5 U.S.C. App. 4 § 103. The Senate amended the Act before its passage, making its financial data disclosure demands applicable to certain senior executive officials and other high-level executives, including some military members. *See* 158 Cong. Rec. S297, S301 (daily ed. Feb. 2, 2012).

The Act is not the first financial disclosure scheme applicable to executive branch officials. For decades, senior executives have had to fill out financial disclosure reports under the Ethics in Government Act (EGA), 5 U.S.C. App. 4 §§ 101 *et seq.* Affected executives must annually file their financial disclosure reports on forms that the Office of Government Ethics (OGE) issues. OGE Form 278 is the latest version of the financial disclosure form. *See* Proposed Collection; Comment Request for an Unmodified OGE Form 201 Ethics Act Access Form, 74 Fed. Reg. 59185, 59186 (Nov. 17, 2009). Form 278—in connection with the EGA and its implementing regulations—generally compels the disclosure of assets, income, financial transactions, liabilities, and other personal information. *See* 5 U.S.C. App. 4 § 102; 5 C.F.R. §§ 2634.301–.311.

The EGA erected several barriers to the disclosure of this financial information. *See* 5 U.S.C. App. 4 § 105(b). Similarly, Form 278s remained subject to the Privacy Act, which, with some exceptions, prohibits an agency from disclosing certain personal information. *Compare* 5 U.S.C § 552(a), *with* Doc. No. 3-3.

One such exception involves "routine use." The Privacy Act defines routine use as "use of [a] record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). Generally, routine uses qualify as exceptions to the Privacy Act's prohibition against the disclosure of financial records absent prior written consent. *See id.*; 5 U.S.C. § 552a(e)(3)(C); *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 362

(D.C. Cir. 2005) (noting that routine uses may include otherwise protected information necessary for an agency to perform its functions under a statute).

Section 11 of the Act, both directly and indirectly, erodes some of these barriers. For instance, section 11 renders section 105(b)(2) of the EGA inapplicable to its provisions mandating Internet publication of Form 278s. *See* 5 U.S.C. App. 4 § 105 note (Executive Branch Reporting). Similarly, in an apparent attempt to implement section 11's Internet publication requirement, the OGE has announced modifications to its list of routine uses. This regulatory change broadly permits the OGE "to disclose on the OGE Web site and to otherwise disclose to any person . . . any public filer reports required to be filed by reason of Federal employment or by the president or vice president." *See* Privacy Act of 1974; Amendment to System of Records, 77 Fed. Reg. 45353 (July 31, 2012).

The Act's disclosure regime differs from the EGA's in other material respects. The Act contemplates nearly contemporaneous reporting of certain securities transactions. *See* 5 U.S.C. App. 4 § 103(l). Furthermore, in addition to its Internet publication prescription, the Act mandates the creation of a searchable OGE database to facilitate public access to the financial data subject to disclosure. *See* 5 U.S.C. App. 4 § 105 note (Executive Branch Reporting).

On July 19, 2012, a group of former, high-ranking federal officials in law enforcement, diplomatic, and national security positions wrote congressional leaders a letter detailing dangers that, in their opinion, the Act threatens. The Court reproduces the pertinent portion of the letter in the subsequent space:

> We believe that this new uncontrolled disclosure scheme for executive branch officials will create significant threats to the national security and to the personal safety and financial security of executive branch officials and their families, especially career employees. Placing complete personal financial information of all senior officials on the Internet would be a jackpot for enemies of the United States intent on finding security vulnerabilities they can exploit. SF-

278 forms include a treasure trove of personal financial information: the location and value of employees' savings and checking accounts and certificates of deposit; a full valuation and listing of their investment portfolio; a listing of real estate assets and their value; a listing of debts, debt amounts, and creditors; and the signatures of the filers. SF-278s include financial information not only about the filing employee, but also about the employee's spouse and dependent children.

Posting this detailed financial information on the Internet will jeopardize the safety of executive branch officials — including military, diplomatic, law enforcement, and potentially intelligence officials — and their families who are posted or travel in dangerous areas, especially in certain countries in Asia, Africa, and Latin America. Embassy and military security officers already advise these officials to post no personal identifying information on the Internet. Publishing the financial assets of these officials will allow foreign governments, and terrorist or criminal groups to specifically target these officials or their families for kidnapping, harassment, manipulation of financial assets, and other abuse.

Equally important, the detailed personal financial information — particularly detailed information about debts and creditors — contained in the SF-278s of senior officials is precisely the information that foreign intelligence services and other adversaries spend billions of dollars every year to uncover as they look for information that can be used to harass, intimidate and blackmail those in the government with access to classified information. Yet under the STOCK Act, these SF-278s will be placed on the Internet for any foreign government or group to access without disclosing their identity or purpose and with no notice to the employees or their agencies. We should not hand on a silver platter to foreign intelligence services information that could be used to compromise or harass career public servants who have access to the most sensitive information held by the U.S. government.

Section 11 could also jeopardize the safety and security of other executive branch officials, such as federal prosecutors and others who are tracking down and bringing to justice domestic organized crime gangs and foreign terrorists. Crime gangs could easily target the families of prosecutors with substantial assets or debts for physical attacks or threats.

Doc. No. 3-2 at 3–4.

Plaintiffs are primarily an assemblage of associations whose members include the

affected class of senior executive officials. Other Plaintiffs, in contrast, sue on their own behalf.

Plaintiffs name two parties as Defendants: (1) the United States; and (2) Don W. Fox, Acting

Director of the Office of Government Ethics. As Plaintiffs sue Mr. Fox in his official capacity, the Court refers to him and the United States collectively as "the United States" or "the Government."

On August 2, 2012, Plaintiffs lodged their Complaint. Doc. No. 1. The thrust of Plaintiffs' Complaint is that the Act's disclosure requirements will compromise their confidential financial information and jeopardize their personal security. Four claims arise from these allegations: (1) violation of the constitutional right to privacy; (2) violation of due process; (3) violation of the Administrative Procedure Act (APA); and (4) declaratory relief.

Contemporaneously with their Complaint, Plaintiffs filed a Motion for Preliminary Injunction. Pls.' Mot. Prelim. Inj., Doc. No. 3. The Motion for Preliminary Injunction expands on the Complaint's themes and calls on the Court to issue a preliminary injunction enjoining the United States from "(1) implementing any portion of Section 11 of the [Act], and (2) requiring employees to submit financial disclosure information so long as such information is subject to Internet publication by federal agencies." Pls.' Mot. Prelim. Inj. 1, Doc. No. 3.

When Plaintiffs initiated the instant lawsuit, the Act's contested disclosure provisions were scheduled to take effect on August 31, 2012. On August 17, 2012, however, the United States filed a Notice to the Court relaying that President Obama signed into law S. 3510, delaying until September 30, 2012 the implementation of the Act's at-issue provisions. Not. Ct., Doc. No. 13.

On August 23, 2012, the Court conducted a telephonic status conference call with the Parties. *See* Doc. Nos. 17–18. During the status conference, counsel for both Parties represented that, in light of S. 3510, Plaintiffs' case could ultimately become moot. For this reason, counsel

for the United States expressed a preference that the Court permit the United States to wait until the end of September to respond to Plaintiffs' Motion for Preliminary Injunction.

The Court advised counsel for the United States that her proposal was unreasonable. The Court explained that, if Congress ended up taking no action, the Court would have to rule on Plaintiffs' Motion before September 30, 2012. Counsel's proposal, however, would have given neither Plaintiffs sufficient time to reply nor the Court adequate time to prepare an opinion before the deadline.

As an alternative to the Government's proposal, Plaintiffs' counsel proposed the filing of a temporary preliminary injunction motion. Although Plaintiffs' counsel characterized this motion as temporary, he explicitly stated that the motion would incorporate arguments from Plaintiffs' Motion for Preliminary Injunction. The United States raised no serious objection to Plaintiffs' incorporation plan during the status conference. After carefully considering the pros and cons of Plaintiffs' proposal, the Court deemed it an advisable course of action.

During these discussions, the Court remained mindful that it might deny Plaintiffs' temporary preliminary injunction motion and that Congress might fail to act. Therefore, with the Parties' input, the Court set a briefing schedule for Plaintiffs' Motion for Preliminary Injunction. The Court memorialized all these understandings in a short Order issued on the heels of the telephonic status conference. *See* Doc. No. 18.

In keeping with this Order, Plaintiffs filed a Motion for Temporary Preliminary Injunction on August 27, 2012. Pls.' Mot. Temp. Prelim. Inj., Doc. No. 19. In essence, the Motion for Temporary Preliminary Injunction is a version of Plaintiffs' Motion for Preliminary Injunction that focuses on the necessity and equity of issuing a quick ruling in light of (1)

Congress's postponement of section 11's implementation and (2) the Parties' stated preference to avoid wasteful litigation.

On September 5, 2012, the United States responded to Plaintiffs' Motion for Temporary Preliminary Injunction. Defs.' Opp'n Mot. Temp. Prelim. Inj., Doc. No. 24. The United States fails to address the substantive arguments that Plaintiffs make in their Motion. Rather, it characterizes Plaintiffs' Motion as a motion for a TRO or a motion to stay in disguise, tersely attempting to demonstrate that neither such motion would entitle Plaintiffs to preliminary injunctive relief, however temporary. Plaintiffs replied two days later, whereupon the matter ripened for review.

## II.   STANDARD OF REVIEW

"[I]njunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam)). Accordingly, a plaintiff must establish each the following four factors to obtain a preliminary injunction: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (quoting *Winter*, 555 U.S. at 20), *vacated on other grounds*, 130 S. Ct. 2371 (2010).

## III.   LEGAL ANALYSIS

## A.   Preliminary Matters

As stated, Plaintiffs assert four claims. They are: (1) violation of the constitutional right to privacy; (2) violation of due process; (3) violation of the APA; and (4) declaratory relief. The

Court declines to address the viability of claims (2), (3), and (4) in the instant Memorandum

Opinion. As for claim (3), Plaintiffs fail to meaningfully argue in their Motion for Preliminary

Injunction, which their Motion for Temporary Preliminary Injunction incorporates by reference,

that the United States' actions violate the APA. Rather, they simply state the legal conclusion

that the contested actions violate the APA. This argument, at most, proposes that the viability of

Plaintiffs' APA claim is derivative of the success of their right to privacy and due process

claims. Therefore, the Court need not analyze the merits of Plaintiffs' APA claim. So too does

the tenability of claim (4), declaratory relief, turn on the fate of Plaintiffs' right to privacy and

due process claims. Hence, this claim warrants no independent analysis.

Plaintiffs make substantive arguments, however, to support their due process claim. All

the same, the Court declines to address these arguments in the interest of judicial economy. For

the purposes of the instant Motion, Plaintiffs prevail on their right to privacy claim. This ruling

suffices to furnish Plaintiffs with all the relief they request at this time. Accordingly, the Court

need not consider Plaintiffs' due process claim.

**B.     Right to Privacy**

*1.      Likelihood of Success on the Merits*

The Supreme Court has recognized a right to privacy "in avoiding disclosure of personal

matters." *Whalen v. Roe*, 429 U.S. 589, 599–601 (1977). Following in the Supreme Court's

footsteps, the Fourth Circuit has long recognized a right to privacy in personal information. *See*

*Taylor v. Best*, 746 F.2d 220, 225 (4th Cir. 1984) (citations omitted). The constitutional right to

privacy protects "[p]ersonal, private information in which an individual has a reasonable

expectation of confidentiality." *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990).

Generally, "[t]he more intimate or personal the information, the more justified is the expectation

that it will not be subject to public scrutiny." *Id.* (citing *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 812 F.2d 105, 112–13 (3d Cir. 1987)). Although there is no clear-cut way to determine the extent to which information is intimate or personal, courts have established that "[f]inancial information . . . is protected by a right to privacy." *Walls*, 895 F.2d at 194 (citation omitted).

A balancing test applies when courts must determine whether government action violates the constitutional right to privacy. *See id.* at 192 (citations omitted); *Best*, 746 F.2d at 225 (citations omitted). When the plaintiff's privacy interests receive constitutional protection, "the defendant has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192 (citations omitted).

However heavy this burden, it is not insurmountable. *See id.* at 194. Governments have a compelling interest in "deterring corruption and conflicts of interests." *Id.* (citation and internal quotation marks omitted). Moreover, when weighing the competing interests of the government and the affected individual, courts must consider the rigor of "any precautions to prevent unwarranted disclosure." *Id.* (citations omitted). Generally speaking, the sufficiency of such measures correlates inversely with the magnitude of the individual's privacy interests.

The right to informational privacy assumes added importance in the Information Age. "[T]he gathering and almost instantaneous transmission of vast amounts of information" marks the Information Age. *Information age*, Dictionary.com, http://dictionary.reference.com/browse/information+age (last visited Sep. 10, 2012). All else equal, these technological innovations increase the likelihood that the publication of personal information will injure those to whom the information pertains. *Cf. Whalen*, 429 U.S. at 605 (citations omitted) ("We are not unaware of the threat to privacy implicit in the accumulation of

vast amounts of personal information in computerized data banks . . . ."); *Walls*, 895 F.2d at 194–95 ("[I]n a complex society, we need to be ever diligent to guard against misuse [of personal information].").

Judged against these principles, Plaintiffs have shown a likelihood of prevailing on the merits of their right to privacy claim. The Act prescribes the publication of sensitive financial information. This information generally includes the disclosure of assets, income, liabilities, and financial transactions, including securities transactions of a certain amount. Under the authority of *Walls*, this "[f]inancial information . . .  is protected by a right to privacy." 895 F.2d at 194 (citation omitted).

That the EGA already mandates the disclosure of such data does not change this conclusion. As outlined above, section 11 of the Act directly and indirectly erodes key EGA safeguards to disclosure.

Take section 105(b)(2) of the EGA. This provision prohibits government actors from making reports available

> to any person . . . except upon a written application by such person stating—
> (A) that person's name, occupation, and address;
> (B) the name and address of any other person or organization on whose behalf the inspection or copy is requested; and
> (C) that such person is aware of the prohibitions on the obtaining or use of the report.

5 U.S.C. App. 4 § 105(b)(2).

Abandoning this relatively transparent application process, the Act ushers in a scheme of unfettered Internet access to the same sensitive information. The Act obligates the president to publish financial disclosure forms filed under the EGA on the official websites of certain executive branch agencies by September 30, 2012. This prescription applies to financial disclosure forms filed in the calendar year 2012, as well as in subsequent years, by senior

executive branch employees. *See* 5 U.S.C. App. 4 § 105 note (Executive Branch Reporting). For the calendar year of 2012, Plaintiff estimates—and the United States has yet to contest—that these provisions (i.e., section 11) subject the financial forms of nearly 28,000 executive branch employees to Internet publication. Furthermore, this section subjects forms filed in subsequent years to Internet publication within thirty days of their filing.

These figures contrast starkly with federal estimates of the number of employees whose financial data the EGA's scheme subjected to disclosure. In 2009, the OGE estimated that an average of 450 Form 201s would be "filed throughout the executive branch each year by members of the public . . . during the period 2010 through 2012." Proposed Collection; Comment Request for an Unmodified OGE Form 201 Ethics Act Access Form, 74 Fed. Reg. 59185, 59186 (Nov. 17, 2009). Form 201s are used to access the information contained in Form 278s. *See id.* Quite plausibly, publishing the private financial information of nearly 28,000 employees—which risks recurring on an annual basis—would dwarf the privacy loss associated with the submission of 450 or so Form 201s.

This is particularly true because the Act contemplates the publication of droves of sensitive financial data on the Internet, including through a searchable database. The right to informational privacy assumes added importance in the realm of cyberspace due to the gathering and almost instantaneous transmission of vast amounts of information. For better or worse, the Information Age has drastically increased the availability and transferability of compromising information; it behooves courts to consider this phenomenon in response to requests to shield sensitive data. *Cf.* Jayne S. Ressler, *Privacy, Plaintiffs, and Pseudonyms: The Anonymous Doe Plaintiff in the Information Age*, 53 U. Kan. L. Rev. 195, 198–205 (2004) (discussing the loss of privacy associated with modern technology).

11

Although the Act requires a login for downloading data contained in the reports, no such requirement attaches to viewing, searching, and sorting data contained in them. *See* 5 U.S.C. App. 4 § 105 note (Executive Branch Reporting). Nor does this login requirement apply to the reports whose Internet publication the Act prescribes before the database launches. *Id.* Lamenting the Act's prohibition against the applicability of section 105(b)(2) of the EGA, Plaintiffs quip that "[a]gency ethics officers are in a far better position to police the applicable ethics rules than the members of the Russian Mafia or the Nigerian scam artists to whom the government now wishes to release this private financial information." *See* Pls.' Mem. Supp. Mot. Prelim. Inj. 26, Doc. No. 3-1. While such strong language smacks of hyperbole, it is obvious that the EGA's relatively transparent application process would deter would-be wrongdoers more than the comparative anonymity the Act commands.

These are just some of the concerns animating the letter the senior law enforcement, diplomatic, and national security officials submitted to congressional leaders. To reiterate, they opine:

> Placing complete personal financial information of all senior officials on the Internet would be a jackpot for enemies of the United States intent on finding security vulnerabilities they can exploit. . . . Posting this detailed financial information on the Internet will jeopardize the safety of executive branch officials . . . and their families who are posted or travel in dangerous areas. . . . Embassy and military security officers already advise these officials to post no personal identifying information on the Internet. . . . Equally important, the detailed personal financial information . . . contained in the SF-278s of senior officials is precisely the information that foreign intelligence services and other adversaries spend billions of dollars every years to uncover . . . . We should not hand on a silver platter to foreign intelligence services information that could be used to compromise or harass career public servants who have access to the most sensitive information held by the U.S. government.

Doc. No. 3-2 at 3–4.

To be sure, their views are not unassailable. They warrant a semblance of respect, however, insofar as they appear to have swayed Congress to revisit the wisdom of the Act.

The preceding analysis is not to suggest that the United States retains no possibility of prevailing in this case. As the *Walls* court held, one cannot gainsay the Government's interest in deterring corruption and conflicts of interests. Indeed, according to its preamble, this is the Act's purpose. *See* STOCK Act, Pub L. No. 112-105, 126 Stat. 291 (2012) (announcing that the Act aims to "prohibit Members of Congress and employees of Congress from using nonpublic information derived from their official positions for personal benefit, and for other purposes.").

Plaintiffs make much of the fact that the Act originally applied only to members and employees of Congress. This argument misses the point. As Plaintiffs acknowledge, prior to its passage, Congress amended the Act to make its reporting and disclosure requirements equally applicable to senior executives. *See* 158 Cong. Rec. S297, S301 (daily ed. Feb. 2, 2012). In short, one could plausibly argue that the Act's preamble, text, and legislative history reflect the intent to promote parity between legislative and executive officials in terms of publishing financial information with a view to combating conflicts of interest and corruption.

However compelling, these interests are insufficient to vitiate Plaintiffs' showing of a likelihood of success on the merits. As elucidated earlier, the financial information the Act subjects to disclosure is quite sensitive. Furthermore, the data's publication portends substantial harm seeing that it stands to affect such a large swath of senior executives. The vehicle of disclosure, cyberspace, exacerbates these risks because it optimizes the accessibility and transferability of the information. Finally, the Act applies to many military, law enforcement, and diplomatic positions. As the senior security officials' letter highlights, these positions may be acutely vulnerable to the misuse of such financial information. At this stage in the litigation,

these interests outweigh the United States' compelling interest in combating conflicts of interest and corruption.[1]

These considerations distinguish this case from *Walls*, *supra*. There, the court affirmed the district court's decision to grant summary judgment for the defendant on the plaintiff's right to privacy claim. 895 F.2d at 190. The plaintiff, Walls, worked as an administrator of a diversion program providing alternative sentencing for nonviolent criminals. *Id.* at 190. Walls refused to fill out a questionnaire that required her to list all of her outstanding debts or judgments and the city terminated her. *See id.*

On appeal, the issue was whether the city's action violated her constitutional right to privacy. *See id.* at 192. The court held that the city's interest in avoiding corruption outweighed her interest in the privacy of her financial information. *See id.* at 194. The court grounded its holding primarily on two considerations. First, the information at issue was "limited." *Id.* Second, the possibility of unauthorized disclosure was minimal because the city kept the information in a private filing cabinet locked at night, and only four persons had access to the information. *Id.*

In reaching this conclusion, the court stressed that its conclusion might have been different had the information been more widely distributed. *Id.* The court then discussed technological advances and the threat they pose to private information. *See id.*

In this case, Plaintiffs' financial information is hardly limited. The Court discussed above why this is so and declines to repeat these observations here. Furthermore, unlike in *Walls*, the Government has not taken adequate precautions to protect Plaintiffs' sensitive financial data.

---

[1] This is not to suggest that the Act serves no other compelling interests. Conceivably, for instance, the Act could spur economic activity by giving investors more confidence in the integrity of the securities' market. Similarly, in counteracting the appearance of corruption, the Act could foster political participation and goodwill. The Court declines, however, to ruminate on what other interests the Act may serve lest it create the appearance of arguing the United States' case for it.

Quite contrarily, the Government has ordered its wholesale disclosure through a means that may maximize the chances that it will fall into the hands of miscreants. Given this widespread distribution, *Walls*'s narrow holding is inapposite; the broader principles it enunciates concerning the balancing of interests and perils of the Information Age lead inescapably to the conclusion that Plaintiffs have shown a likelihood of success on the merits.

One might argue that ruling in Plaintiffs' favor raises the specter of runaway challenges to the Act as it applies to members of Congress and their employees. This argument, albeit interesting, does not affect the propriety of temporary preliminary injunctive relief.

At this juncture, the argument fails both procedurally and substantively. As for procedure, this Opinion, even if appealable, does not constitute an ultimate decision on the merits. Depending on the actions of Congress, the United States may have an opportunity to broach this topic at a later point in time.

Substantively, Plaintiffs maintain that legislative officials have traditionally faced more stringent disclosure demands, thereby justifying the Act's original disparate treatment of legislative and executive officials. Even though substantiating this argument will likely require Plaintiffs to draw fine distinctions, it is not implausible on its face. What is more, S. 3510, which delays the date on which section 11 takes effect until September 30, also applies to the Act's Internet posting prescriptions for legislative officials (i.e., section 8). Accordingly, at least for the time being, the Court's decision does not open a Pandora's box.

Some housekeeping is in order. Plaintiffs make several other arguments to support the first prong of the test for preliminary injunctive relief. The Court declines to address these arguments in the interest of judicial economy. The preceding discussion demonstrates that Plaintiffs have shown a likelihood of success on the merits of their right to privacy claim.

Although this claim may have other facets, the core question is whether Plaintiffs' interest in protecting the privacy of their information outweighs the Government's countervailing interest in combating corruption. For now, Plaintiffs have shown that it is more likely than not that they can establish this claim. This is especially the case in light of the United States' failure to respond to the substantive arguments Plaintiffs incorporated by reference. If the litigation does not become moot due to congressional action, the United States will have another opportunity to test the merits of Plaintiffs' right to privacy and other claims. Needless to say, the Court's resolution of the instant Motion in Plaintiffs' favor fails to preclude them from raising their alternative arguments later on.

　　　　2.　　　*Irreparable Harm*

Plaintiffs have shown that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief. Usually, for harm to be irreparable, it must be both actual and imminent. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Plaintiffs easily satisfy the requirement of imminence. The Act is scheduled to take effect on September 30, 2012, which is just over two weeks away.

The harm is actual for several reasons. "[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing cases); *cf. Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction."). Furthermore, generally speaking, the public disclosure of confidential information is irreparable. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983). This is especially the case where, as here, monetary damages are an inadequate remedy. *See Multi-*

*Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (citation and internal quotation marks omitted). In this case, monetary damages are an inadequate remedy for several reasons, including the fact that they are unavailable. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *see also United States v. Mitchell*, 445 U.S. 535, 538–39 (1980); *Smoking Everywhere, Inc. v. US FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010). Simply put, the publication of Plaintiffs' financial information is a bell that one cannot unring. Accordingly, Plaintiffs have shown a strong likelihood of irreparable harm.

  *3.  Balance of the Equities*

  The balance of the equities tips overwhelmingly in Plaintiffs' favor. If the Court denies Plaintiffs' Motion for Temporary Preliminary Injunction, Plaintiffs' financial data will be subject to disclosure even though the United States has yet to identify interests sufficient to outweigh this irreparable harm. If the Court grants the Motion, however, the status quo that Congress created in revisiting the Act—one that already authorizes disclosure—will remain in place for merely a month. Assuming Congress sticks with its decision to make the Act applicable to Plaintiffs, the United States will enjoy an opportunity to respond to Plaintiffs' Motion for Preliminary Injunction by the end of October.

  There are essentially two outcomes at this point. In one scenario, the Court would grant Plaintiffs' Motion for Preliminary Injunction, in which case the United States stands to lose no more than it has already lost by the Court's decision to grant the instant Motion. In the second situation, if the Court deems preliminary injunctive relief improper, section 11's effective date will have been delayed for merely a month. The loss the second outcome risks is rather

ephemeral and metaphysical, paling in comparison to the irreparable harm that diffuse dissemination threatens.

The United States pegs the instant Motion as a repackaged version of Plaintiffs' Motion for Preliminary Injunction. Further, the United States suggests that treating the instant Motion as anything other than a motion for a TRO or a motion to stay would "circumvent" this Court's Order giving the Government until September 21 to respond to the Motion for Preliminary Injunction.

The Court disagrees with the United States' view of the record. Counsel for the United States stated during the August 23 telephonic status conference that she preferred not to respond to Plaintiffs' Motion for Preliminary Injunction before September 24 or so, representing that the House was not expected to be in session by this date.

The Court advised counsel for the United States that her position was untenable in light of the looming effective date. To reiterate, if Congress wound up taking no action, the Court would have to rule on Plaintiffs' Motion before September 30. Yet the Government's proposal would have given Plaintiffs insufficient time to reply to the Government's response, as well as the Court inadequate time to prepare an opinion, before the deadline. Therefore, in fashioning the August 23 Order's briefing schedule, the Court sought to strike a balance between the Parties' desire to avert needless litigation and the need that they timely complete briefing on Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs' counsel unequivocally stated during the telephonic status conference that he would incorporate by reference arguments from their Motion for Preliminary Injunction. Plaintiffs did precisely this in the instant Motion, thereby giving the Government further notice of their design to delve into the merits of the dispute. The United States expressed no objection

to this technique during the telephonic status conference. Nor did it formally object when Plaintiffs submitted the instant Motion. Instead, the United States blithely branded Plaintiffs' Motion as "repackaged," failing to respond to its substantive arguments. Moreover, Plaintiffs' Motion for Preliminary Injunction has been pending since early August. Therefore, even though the Court has granted the United States extensions of time to respond to the same, the United States has had plenty of time to familiarize itself with its contents. Indeed, the record reflects that the United States has filed several other legal memoranda in this case. *See*, *e.g.*, Doc. Nos. 21–23. Therefore, the United States' intimation that resolving the instant Motion on the merits would prejudice it rings hollow.

For these reasons, the balance of the equities tips in Plaintiffs' favor.

*4.     Public Interest*

Granting Plaintiffs' Motion for Temporary Preliminary Injunction serves the public interest for a myriad of reasons, many of which the Court has already covered. Therefore, the Court incorporates by reference its analysis from Part III.B.1–3. Furthermore, the Fourth Circuit has explicitly held that "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). Accordingly, Plaintiffs have satisfied the fourth prong of the test for preliminary injunctive relief.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Temporary Preliminary Injunction. Because congressional action may moot this temporary preliminary injunction sometime in the near future, the Court stays briefing until September 24, 2012. If this date passes and congressional action has not mooted the Parties' dispute, the Court directs the

Parties to propose a briefing schedule for Plaintiffs' Motion for Preliminary Injunction. A

separate Order follows.

|  |  |
|---|---|
| September 13, 2012 | /s/ |
| Date | Alexander Williams, Jr. |
|  | United States District Judge |