## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SENIOR EXECUTIVES ASSOCIATION, *et al.*,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Civil Action No. 8:12-cv-2297-AW** |
| **UNITED STATES, *et al.*,** | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ iii

INTRODUCTION ............................................................................................................1

STATUTORY BACKGROUND ....................................................................................... 3

PROCEDURAL STATUS.................................................................................................. 8

ARGUMENT..................................................................................................................... 9

   I.    Plaintiffs Have Standing ......................................................................................9

       A.    One Threatened Injury – Publication Itself – is Palpable and Imminent..........9

       B.    Defendants Can Be Enjoined from Facilitating Harm That Will be Perpetrated by a Third Party. ...................................................................................... 12

   II.    Plaintiffs' Administrative Procedure Act Claim is Ripe............................................ 13

   III.    Plaintiffs are Likely to Succeed on the Merits of Their Claim. ................................ 15

       A.    Plaintiffs' Claim is an As-Applied Claim, not a Facial Challenge. ................ 15

       B.    The Disclosure of Plaintiffs' Personal Financial Information Violates Their Constitutional Right to Privacy...................................................................... 15

           1.    The Fourth Circuit recognizes a constitutional right to privacy in personal financial information................................................................................ 15

           2.    Plaintiffs' privacy interests are not outweighed by any alleged compelling government interest.................................................................................. 21

               a.    Governmental interests prompting the invasion are either too broad or are disconnected to Plaintiffs, and are not compelling............ 21

               b.    Internet publication of career civil servants' financial disclosures is not narrowly tailored to advance government's interests. ............ 24

               c.    The foreseeable harm to Plaintiffs outweighs any benefit to the government. ...................................................................................... 25

           3.    There are no safeguards that can protect public access websites from anonymous browsing. ............................................................................ 27

       C.    The STOCK Act's Internet Posting Requirement Cannot Be Applied to Executive Branch Filers Who Submitted Their Form 278s Prior to Passage of the STOCK Act.......................................................................................... 32

IV. Plaintiff Will Suffer Irreparable Harm When Section 11 Becomes Effective............ 36

V. The Balance of Harms and Public Interest Weigh in Favor of Entry of a Preliminary Injunction. ............................................................................................................... 37

VI. A Preliminary Injunction is in the Public Interest. ..................................................... 37

CONCLUSION............................................................................................................................ 37

403737580v1

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                            <u>Page</u>

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ................................. 12

*AFGE v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786 (D.C. Cir. 1997)..................... 17-18

*Allen v. Wright*, 468 U.S. 737 (1984).................................................................12

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)......................................................20

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986) ....................13

*Camreta v. Greene*, 131 S. Ct. 2020 (2011)........................................................11

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) .......................................11

*Chandler v. Miller*, 520 U.S. 305 (1997) ............................................................25

*Cobell v. Norton*, No. 1:96CV01285(RC), 2001 WL 1555296 (D.D.C. Dec. 6, 2001)......31

*Condon v. Reno*, 155 F.3d 453 (4th Cir. 1998) ...................................................16

*Doe v. Obama*, 631 F.3d 157 (4th Cir.), *cert. denied*, 131 S. Ct. 2938 (2011) ..................12

*Duplantier v. United States*, 606 F.2d 654 (5th Cir. 1979) ...................................24, 26, 27

*E. Enters. v. Apfel*, 524 U.S. 498 (1998) .............................................................34

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)..............................16

*Facebook, Inc. v. ConnectU LLC*, No. C 07-01389 RS, 2007 U.S. Dist. LEXIS 61962
    (N.D. Cal. Aug. 13, 2007)...........................................................................31

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000).................................................................. 11-12

*Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envt'l Control*,
    317 F.3d 357 (4th Cir. 2002)........................................................................9

*Haig v. Agee*, 453 U.S. 280 (1981) ....................................................................21

*Heinl v. Godici*, 143 F. Supp. 2d 593 (E.D. Va. 2001) ......................................14

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ......................................32, 33

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011)................................37

*Long Term Care Partners, LLC v. United States,* 516 F.3d 225 (4th Cir. 2008)...............14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...........................................12

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)......................................... 13-14

*Mich. Peat v. EPA*, 175 F.3d 422 (6th Cir. 1999) ...............................................13

*Mirant Potomac River, LLC. v. EPA*, 577 F.3d 223 (4th Cir. 2009).....................12

*MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293 (C.D. Cal. 2007) ....................31

*NASA v. Nelson*, ___ U.S. ___, 131 S. Ct. 746 (2011)....................................17, 18

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ...................... 13-14

*Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656 (1989) ................................22, 27

*Neb. ex rel. Nelson v. Cent. Interstate Low-Level Radioactive Waste Comm'n*,
  26 F.3d 77 (8th Cir. 1994).........................................................................................13

*Nelson v. NASA*, 568 F.3d 1028 (9th Cir. 2009) ................................................17

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ...................................................................................................12

*NRDC v. Watkins*, 954 F.2d 974 (4th Cir. 1992).......................................................12

*O'Brien v. DiGrazia*, 544 F.2d 543 (1st Cir. 1976) ..........................................18

*Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) .....................................20

*Paul v. Davis*, 424 U.S. 693 (1976)........................................................................18

*Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978).................................................27

*Pye v. United States*, 269 F.3d 459 (4th Cir. 2001).............................. 10-11, 13

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989).............................21

*Sweet Life v. Dole*, 876 F.2d 402 (5th Cir. 1989)..............................................14

*Taylor v. Best*, 746 F.2d 220 (4th Cir. 1984).............................................. 15-16

*Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir. 1989) ................................. 22-23, 27

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ......................................24

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*,
  489 U.S. 749 (1989) ...................................................................................................20

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ...............22, 24, 26, 27

*United States v. Salerno*, 481 U.S. 739 (1987)................................................21

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)....................................34

*Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) ................31

*Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990) ...................16, 18, 21

*Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990) ..............................9

*Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164 (4th Cir. 2010) .......................32

*Watson v. Lowcountry Red Cross*, 974 F.2d 482 (4th Cir. 1992) .......................9

*Whalen v. Roe*, 429 U.S. 589 (1977) ...........................................................16, 17

*Wiesmueller v. Kosobucki*, 571 F.3d 699 (7th Cir. 2009) ..................................10

403737580v1

## Statutes, Rules and Regulations

Privacy Act of 1974,
    5 U.S.C. § 552a ...........................................................................3, 34, 35

Ethics in Government Act,
    5 U.S.C. App'x §§ 101 *et seq.*.....................................................................3
    5 U.S.C. App'x § 105(b)(2) ................................................28, 29, 35

5 U.S.C. § 704 .........................................................................................13

5 U.S.C. § 3131(a)(2) ..............................................................................27

STOCK Act,
    Pub. L. No. 112-105, 126 Stat. 291 (2012).....................................1, 5, 23
    Pub. L. No. 112-105, § 9(b), 126 Stat. 291 ...........................................23
    Pub. L. No. 112-105, § 11, 126 Stat. 291.........................3, 28, 29, 33

77 Fed. Reg. 45353 (July 31, 2012) ........................................................33

77 Fed. Reg. 66075 (Nov. 1, 2012) .....................................................7, 30

74 Fed. Reg. 59185 (Nov. 17, 2009) ......................................................19

## Other Authorities

U.S. Const. art. I, § 2, art. II, §§ 1, 2, 4...............................................26

125 Cong. Rec. 10939 (1979) ...................................................................7
158 Cong. Rec. S187 .................................................................................4
158 Cong. Rec. S195 .................................................................................4
158 Cong. Rec. S196 ..............................................................................4-5
158 Cong. Rec. S290-31 (daily ed. Feb. 2, 2012)......................................5
158 Cong. Rec. S5952 (daily ed. Aug. 2, 2012) ........................................6

S. Rep. No. 95-170, 95th Cong., 1st Sess. (1977) ..................................21

Cong. Res. Serv. Rep. R424495,
*available at* http://www.fas.org/sgp/crs/misc/R42495.pdf..........................23

S. 3510, 112th Cong., 2d Sess. (2012)............................................5, 6, 26
S. 3625, 112th Cong., 2d Sess. (2012)............................................5, 6, 26

Kathleen Clark, *Do We Have Enough Ethics in Government Yet?:*
*An Answer from Fiduciary Theory*, 1996 U. ILL. L. REV. 57 (1996) ....................24, 26-27

Harry Surden, *Structural Rights in Privacy*, 60 SMU L. Rev. 1605(2007)................19-20

403737580v1

## **INTRODUCTION**

Because Defendants' Motion to Dismiss ("MTD"), ECF No. 39, and their Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opp. to PI"), ECF No. 40, contain largely verbatim arguments, Plaintiffs respond to both filings with this single memorandum.[1]

Plaintiffs submit this memorandum with the same deep concerns they have expressed to the Court throughout this litigation – that the implementation of Section 11 of the Stop Trading on Congressional Knowledge ("STOCK") Act, Pub. L. No. 112-105, 126 Stat 291 (2012), will eviscerate their right to privacy in their personal financial information, and that the widespread public availability of this information on the Internet will pose a serious threat to them and their families.  While Congress has acted to postpone the implementation of Section 11 until December 8, 2012, Plaintiffs, and others like them (*i.e.*, career Executive Branch employees who are not politically elected or appointed) face an impending and pervasive violation of their right to privacy unless this Court issues further temporary or preliminary relief.

Defendants' arguments that challenge Plaintiffs' ability to bring this case or Plaintiffs' entitlement to the relief requested are without merit.

First, Plaintiffs have standing to bring this action.  Plaintiffs have not only alleged but presented substantial evidence showing that the very publication of their personal financial information on the Internet is an invasion of their privacy that will cause actual and immediate

---

[1]  Because the page limit for a reply is less than for an opposition, Plaintiffs have filed an unopposed motion for leave to exceed the page limits with respect to the use of this document as a reply.  The total number of pages in this memorandum (38) is substantially less than Plaintiffs would have been entitled to file using separate memoranda (75).

1

harm.  This harm – and other serious harms flowing directly from it – can be remedied by the requested relief.  Thus, Plaintiffs have standing to bring this suit.

Second, Plaintiffs' APA claim is ripe.  Under the STOCK Act, agencies are required to publish Plaintiffs' personal financial information on the Internet by a certain date – currently, December 8, 2012, pursuant to Office of Government Ethics ("OGE") regulations.  Because OGE and the agencies have indicated that they will do what Congress mandated, this is final agency action, subject to judicial review at this time.

Third, Plaintiffs are likely to succeed in this action.  Plaintiffs have demonstrated that the Fourth Circuit has specifically recognized a constitutional right to informational privacy that protects personal financial information.  They have shown that the limited disclosure of private information under the current regulatory scheme does not waive their interests in avoiding worldwide, uncontrolled disclosure via the Internet.  They have dispelled all of the Government's "compelling interest" claims – as either not applying to them or already being satisfied under the current regime.  They show in this memorandum that the OGE's proposed Internet access form will be completely ineffective in preventing anonymous access to their personal financial data.  And they have shown that Section 11 of the STOCK Act may not be applied retroactively.  Finally, as detailed below, the rest of the preliminary injunction factors weigh in support of granting Plaintiffs' Motion for Preliminary Injunction.

Accordingly, Defendants' Motion to Dismiss should be denied and Plaintiffs' Motion for Preliminary Injunction should be granted.

## STATUTORY BACKGROUND

Senior Executive Branch employees have been required to file annual financial disclosure reports with their employing agencies pursuant to the Ethics in Government Act, 5 U.S.C. App'x § 101 *et seq.* (the "EGA").  The EGA, along with its related regulations and OGE Form 278, requires disclosure of assets, income, financial transactions, liabilities, and other personal information of the employees and their families.  Although the EGA provided that these reports would be made available to the public via written request, the EGA required safeguards that deterred and punished access and use by abusers.  In addition to the EGA protections, OGE Form 278s remained subject to the protections of the Privacy Act of 1974, 5 U.S.C. § 552a.

The STOCK Act, Pub. L. No. 112-105, §11, 126 Stat. 291, expressly repealed or drastically weakened these protections and mandated Internet publication of the information in these disclosure reports for some 28,000 executive branch employees.  These employees' personal information will be immediately downloadable from agency websites, and information from the forms will later be available, with no login requirement, on a searchable online database that OGE is creating.

Plaintiffs described the law and practice regarding reporting and availability of federal employees' personal financial information, and the changes made by the STOCK Act, in their Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Mem. ISO PI") at 4-12, ECF No. 3-1.

## Defendants Mischaracterize the Legislative History of the STOCK Act

The legislative history of the Stock Act says nothing about the purpose for extending the Internet posting of financial information to Executive Branch employees.  Defendants mislead

the Court in arguing otherwise. Defendants selectively quote portions of the legislative record out of context, giving the impression that lawmakers' concerns extended beyond the legislative branch. *See* MTD at 9-10, 32-33; Opp. to PI at 8-9, 29, 32, 45 (citing partial quotations of Senators Lieberman and Begich regarding online posting, and erroneously stating that "several members of Congress expressed the concern that requiring written requests for OGE Form 278s was 'out of date'"). However, adjacent to every quotation cited by the Government is language that demonstrates that lawmakers were addressing only a congressional problem.[2] The legislative history does not address OGE Form 278s, as Defendants claim; the Senators who are quoted by Defendants spoke only in reference to Congress's own disclosure forms – consistent with the express purpose of the statute.[3] As Plaintiffs previously explained, the statute was

---

[2] *See* 158 Cong. Rec. S187:

> There are two other very important provisions. One requires Members of Congress and our staffs to file a statement within 30 days of any transaction, purchase, or sale of a stock or other security with the Senate—and that would immediately go on line, as will now, as a result of this legislation, the annual financial disclosure statements that we file. Incidentally, these statements are now available to the public but you have to go to the office here in the Senate to get them and copy them. That is out of date and not consistent with the general principles of transparency and disclosure that I think people rightly expect of Congress today.

(Senator Lieberman); 158 Cong. Rec. S195 ("The current system we have here is outdated, not transparent. It is not easily accessible to our folks back home. *Under this new provision, Members, candidates, and staffs must file their financial disclosure forms electronically.*") (Senator Begich) (emphasis added); 158 Cong. Rec. S196:

> But Senator BEGICH and Senator TESTER require that the annual financial reports we file, which are public documents—for the public to see them, they or some representative have to go to the office of the Secretary of the Senate to look at them or make copies. We are in the information age, the digital age. So Senator BEGICH and Senator TESTER took a small step on the bill—which is a large step for the American people—which is that these reports will now be online and electronically filed.

(Senator Lieberman).

[3] "[T]o prohibit Members of Congress and employees of Congress from using nonpublic information derived from their official positions for personal benefit, and for other purposes." Pub. L. No. 112-105, 126 Stat. 291.

extended to the executive branch, without hearings or deliberation, based on a goose/gander rationale.[4]

## **Recognizing its Dangers, Congress has Twice Postponed Online Posting**

The more pertinent legislative history relates to what Congress has said and done since it focused on the risks of Internet posting of Form 278.  Following the STOCK Act's passage, a number of groups expressed concern for the damage online publication of financial disclosure forms could wreak on privacy, personal safety, and national security.  *See e.g.*, Mem. ISO PI, Ex. 1 (letter from former Secretary of Homeland Security Michael Chertoff and other former high officials).  Congress directly responded to these concerns by twice extending the Internet posting deadline for senior executive personnel.  *See* S. 3510, 112th Cong. 2d Sess. (2012) (extending deadline to September 30, 2012); S. 3625, 112th Cong. 2d Sess. (2012) (further extending deadline to December 8, 2012).

In the first extension, Congress formally recognized the serious dangers facing federal personnel and delayed online posting by an act entitled "[t]o prevent harm to the national security or endangering the military officers and civilian employees to whom internet publication of certain information applies, and for other purposes."  S. 3510.  In connection with the second extension, similar concerns were voiced: "application of one provision of the STOCK Act requiring online posting of financial data . . . would potentially impact the national security and

---

[4] *See* Mem. ISO PI at 9, 23-24 (citing 158 Cong. Rec. S290-315 (daily ed. Feb. 2, 2012) ("what is good for the goose . . . should be good for the gander" because "[w]e have heard quite a bit from the President on the campaign trail about 'fairness,'" and it would be "fair" to impose the same Internet posting requirement on the Executive Branch.) (Sen. Shelby)).

5

the personal safety of national security and law enforcement professionals and their families."

158 Cong. Rec. S5952 (daily ed. Aug. 2, 2012) (Statement of Sen. McConnell).

These concerns led Congress to task the Director of the Office of Personnel Management

to contract with the National Academy of Public Administration ("National Academy") to

> (1) conduct a study of issues raised by website publication of financial disclosure forms as is required under the STOCK Act . . . [which shall examine the nature, scope, and degree of risk, including risk of harm to national security, law enforcement, or other Federal missions and risk of endangerment, *including to personal safety and security, financial security (such as through identity theft), and privacy*, of officers and employees and their family members, that may be posed by website and other publication of financial disclosure forms and associated personal information . . . .]; and

> (2) issue a report containing findings and recommendations.

*See* S. 3625, § 2(a), (b) (emphasis added).  The Act requires the National Academy to submit its

report by May 28, 2013, although publication will already have occurred by that date unless

enjoined by this Court.  S. 3625, § 2(c).

An effort will be made during the current "lame duck" session of Congress to extend the

posting deadline further, *see* Declaration of William Bransford (ECF No. 37-1), perhaps to a date

that permits evaluation of the study that has been ordered.

This post-enactment legislative history leaves no doubt that Congress recognizes the very

risks (*e.g.*, personal security, identity theft, and invasion of privacy) that Plaintiffs have cited to

this Court and on which the Court relied in its Memorandum Opinion ("Mem. Op.") (Sept. 13,

2012) at 11-13, Doc. No. 26.

**OGE Proposed Form 201-A Provides No Protection**

As Plaintiffs explained in their earlier papers, section 105(b)(2) of the EGA required persons requesting financial disclosure forms to leave a "footprint in the sand," thereby enabling effective enforcement of the Act's prohibitions on certain uses of the information in disclosure reports.[5] That essential "footprint" has been eliminated by the STOCK Act.

On November 1, 2012, OGE requested emergency clearance from the Office of Management and Budget to use a proposed online Form 201-A in connection with the Internet posting of financial disclosure reports. *See* Emergency Clearance Notice and Request for Agency and Public Comments, 77 Fed. Reg. 66075-76 (Nov. 1, 2012). The proposed form would require a person to provide his or her name and city, state, and country of residence to obtain online access to financial records. *See id.*

Proposed Form 201-A is apparently OGE's attempt to reassure the Court that persons seeking online access will still have to leave a "footprint in the sand." But the online form will serve no such purpose; it provides no barrier to anonymous access to the financial data, even by technically unsophisticated users, as explained in comments filed in response to the Federal Register notice. *See* Comments of ACLU, Nov. 6, 2012 (Exhibit A hereto); Comments of SEA,

---

[5] *See* Mem. ISO PI at 7 n.1. *See also* 125 Cong. Rec. 10939 (1979) (Statement by Rep. Harris, sponsor): [H.R. 2805 Ethics in Government Act Amendment] charges the Attorney General with the responsibility of bringing a civil action against any individual who obtains or uses a report in a prohibited manner. *It is obvious that to effectively enforce these prohibitions, it is necessary to keep a record of the individuals granted access to the disclosure report. This bill provides for such a record. I am fearful that public disclosure of the personal financial records*, not only of elected and senior appointed officials, but *also of career civil service employees and their spouses could lead to abuse*s or [sic] *privacy rights of these individuals without this application requirement*. This requirement in no way limits public access to disclosure reports, it merely provides the "footprint in the sand" necessary for effective enforcement of the prohibitions on certain uses of the information in disclosure reports.
(emphasis added).

Nov. 6, 2012 (Exhibit B hereto).  The worthlessness of this proposed security protection is discussed in more detail below.

## PROCEDURAL STATUS

Plaintiffs filed this lawsuit on August 2, 2012, when the STOCK Act required Internet publication of financial disclosure forms by August 31, 2012.  Soon afterward, Congress extended that deadline to September 30, 2012.  On September 13, 2012, this Court entered a Temporary Preliminary Injunction extending the deadline to October 31, 2012, because it appeared likely that Congress would take further action.  Congress did, further extending the deadline to December 8, 2012, and ordering the study described above.

On October 18, 2012, Plaintiffs filed a Motion to Extend the Temporary Preliminary Injunction ("Mot. to Extend TPI") (ECF No. 37) pending completion of the congressionally-mandated study, or at least until after the current "lame duck" session, during which Congress may again take action.  Defendants opposed that motion, ECF No. 43.  Plaintiffs have now filed their reply.  ECF No. 44.

On October 19, 2012, Defendants filed a Motion to Dismiss, and on October 26 filed their Opposition to Plaintiff's original Motion for Preliminary Injunction.  Plaintiffs respond herein to these two documents.

## ARGUMENT

### I.      Plaintiffs Have Standing

#### A.      One Threatened Injury – Publication Itself – is Palpable and Imminent.

Defendants assert that "Plaintiffs have not alleged a concrete and imminent injury directly resulting from the operation of Section 11."  MTD at 16; Opp. to PI at 14.  Not so.  The very publication of Plaintiffs' personal financial information on the Internet is a primary harm that will most certainly and immediately occur if Section 11 goes into effect.  That harm – the evisceration of Plaintiffs' financial privacy – is quite sufficient to support Plaintiffs' standing, even without consideration of the secondary harms arising from misuse of the published information, as described in the Chertoff letter and Plaintiffs' declarations.

The Fourth Circuit has recognized that the invasion of privacy itself is a cognizable harm. *See*, *e.g.*, *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envt'l Control*, 317 F.3d 357, 370 (4th Cir. 2002) (upholding challenged abortion regulations only because "South Carolina's statutes and Regulation . . . assure the patient's confidentiality, such that protected information will not be disclosed"); *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487-88 (4th Cir. 1992) (recognizing that a blood donor's right to privacy would be implicated by public disclosure of his or her identity); *Walls v. City of Petersburg*, 895 F.2d 188, 194-95 (4th Cir. 1990) (adjudicating on the merits plaintiff's claim that disclosure of her financial information would violate her constitutional right to informational privacy).

The relief sought here – an injunction preventing the implementation of Section 11 of the STOCK Act – will directly prevent the threatened injury.  No more is required for standing.

Although unnecessary to establish standing here, the serious secondary harms alleged by Plaintiffs would also be sufficient for standing, even though it is not certain when or to whom they will occur.  As Judge Posner recently explained:

> "[A]s long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress . . . , the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." [*MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007).] This is confirmed by the Supreme Court's ruling in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 664-66 (1993), that the loss of an opportunity to compete for a position (for example because of discrimination) is injury enough to support standing; there is no need to show that the applicant would have won the competition for the position, provided that he had a "realistic chance" of winning. This shows that a modest probability of injury is enough for standing."

*Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009) (citations omitted).  The secondary harms alleged by Plaintiffs are certainly non-negligible, non-theoretical, and quite realistic, as demonstrated by the Chertoff letter, Plaintiff's declarations, and Congress's response.

The Fourth Circuit has followed the same rule in standing cases.  In *Pye v. United States*, 269 F.3d 459 (4th Cir. 2001), landowners sued to force the Corps of Engineers to comply with statutory and regulatory requirements before permitting the construction of a road on an adjacent property.  Plaintiffs alleged that the improved road would provide better access to surrounding properties, including their own, and "may lead to trespassing, vandalism, and looting of historic sites" by third parties.  *Id.* at 468.  The Fourth Circuit held that plaintiffs had standing, even though they could not present any evidence indicating exactly when, or where, or to which property the likely trespassing, vandalism, or looting would occur: "Plaintiffs' injury is caused by the improved road  . . . and but for the improvements on the road authorized by the Corps' permit, the injuries [plaintiffs] complain of, an increased *probability* of looting and destruction of cohesion in the area, have less *probability* of occurring."  *Id.* at 471 (emphasis added).  The

10

Fourth Circuit did not require the plaintiffs in *Pye* to demonstrate a certainty that the harms would occur, or to wait until looting actually occurred.

Thus, under the law of the Fourth Circuit and elsewhere, the realistic threat of harm, facilitated by the government's actions, is enough for standing purposes.  That is the situation here.  Plaintiffs should not have to wait until someone steals their identity or kidnaps their child for ransom to have standing to challenge the Internet publication of their financial data.

Defendants also assert that Plaintiffs Assembly of Scientists and Janice Caramanica lack standing.  MTD at 20-21.  The Court need not even consider those assertions, for it is well established that the standing of one plaintiff is sufficient to allow a claim to proceed.  *See, e.g., Camreta v. Greene*, 131 S. Ct. 2020, 2034 n.9 (2011) (noting that one plaintiff's loss of standing was "immaterial" because another plaintiff had standing); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977) ("We conclude that appellee Population Planning Associates, Inc. (PPA) has the requisite standing and therefore have no occasion to decide the standing of the other appellees.").

In any event, both have standing.  The Assembly of Scientists has many members who are subject to the publication requirement of Section 11, and the Assembly itself was founded in part because of scientists' grave concerns about the STOCK Act.  *See* Second Declaration of Josh Zimmerberg (Exhibit C hereto).

Plaintiff Caramanica has standing because the Internet publication requirement of the STOCK Act harmed her career by causing her to cease applying for SES-level positions; the requested relief would remove the danger and allow her to resume her application.  *See* Declaration of Janice Caramanica, ECF No. 3-8.  Such a change in behavior is sufficient for standing.  *See, e.g., Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149,

156 (4th Cir. 2000) (plaintiff's reduced use of a lake because of his concern about the defendant's pollution "plainly demonstrated injury in fact").  As noted above, the fact that Ms. Caramanica was not assured of obtaining an SES position is not fatal to her standing.  *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 664-66 (1993); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (to have standing, "Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract").

> **B.      Defendants Can Be Enjoined from Facilitating Harm That Will be Perpetrated by a Third Party.**

The fact that some of the harms Plaintiffs are likely to suffer will occur at the hands of third parties who may misuse the financial information published by the Defendants does not bar the Court from enjoining that publication.  Third-party use of Plaintiffs' online information is not independent, but rather flows directly from the government's publication of that information.[6] Such use is therefore "fairly traceable" to the publication, and would even satisfy the more stringent test of "but-for" causation.[7]  Redressability is also not a problem: if the Court enjoins Internet publication of Plaintiffs' financial data, the threatened harms become almost non-existent.

---

[6] Because of this direct relationship, Defendants' cases are inapposite.  *See, e.g.*, *Allen v. Wright*, 468 U.S. 737 (1984) (no direct connection between IRS tax exemption and school policies); *Doe v. Obama*, 631 F.3d 157 (4th Cir.) (funding regulations for embryonic stem cell research did not injure embryos donated voluntarily by private donors for such research), *cert. denied*, 131 S. Ct. 2938 (2011); *Mirant Potomac River, LLC. v. EPA*, 577 F.3d 223 (4th Cir. 2009) (injury was not caused by EPA action but by independent state emission standards).

[7] For standing purposes, the necessary causal connection exists where injury is "fairly traceable" to the defendant's actions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The "fairly traceable" standard is less stringent than tort or "but-for" causation, and requires a showing that the defendant caused or contributed to the kinds of injuries complained of.  *NRDC v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992).

*Pye v. United States*, 269 F.3d 459 (4th Cir. 2001), also refutes Defendants "third party" argument.  The "trespassing, vandalism, and looting of historic sites" feared by the plaintiffs,(*id.* at 468), would have been carried out by third parties, not by the defendant Corps of Engineers. However, that was no obstacle to standing.

## II.     Plaintiffs' Administrative Procedure Act Claim is Ripe

Plaintiffs' APA challenge is ripe, as Plaintiffs are confronted with "final agency action for which there is no other adequate remedy in a court" and which is therefore "subject to judicial review."  5 U.S.C. § 704; *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (There is a "strong presumption that Congress intends judicial review of administrative action" and "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.")  (internal citation and quotations omitted).

The express language of the STOCK Act leaves the Office of Government Ethics and other agencies no discretion regarding publication of employees' financial data on the Internet. Where, as here, agencies have indicated that they intend to do what Congress has mandated, there is nothing left for the agencies to do and their actions are final and subject to judicial review.  *See, e.g., Mich. Peat v. EPA*, 175 F.3d 422, 428 (6th Cir. 1999) (final agency action where "there was nothing left for the EPA to do"); *Neb. ex rel. Nelson v. Cent. Interstate Low-Level Radioactive Waste Comm'n*, 26 F.3d 77, 80 (8th Cir. 1994) (final agency action where "the Commission had nothing left to do").  As the Supreme Court has explained:

> a regulation is not ordinarily considered the type of agency action 'ripe' for
> judicial review under the [Administrative Procedure Act (APA)] until the scope of
> the controversy has been reduced to more manageable proportions, and its factual

13

components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms *or threatens to harm* him.

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990)) (emphasis added).

Here, Defendant OGE and other federal agencies are about to implement Section 11 of the STOCK Act by concrete action applying its provisions to the Plaintiffs: Internet publication of their financial information. That action imminently threatens to harm Plaintiffs. There will be no review of the agency action unless it is undertaken now – before publication.

Defendants seem to argue that only actual Internet publication itself would constitute final and reviewable agency action. *See* MTD at 22-24; Opp. to PI at 18-20. That makes no sense, as publication is the very action sought to be enjoined. But if that were correct, then final agency "action" would not be required because plaintiffs would suffer irreparable harm while awaiting final action. *See, e.g., Long Term Care Partners, LLC v. United States,* 516 F.3d 225, 233 (4th Cir. 2008) (exception to the Section 704 finality requirement where aggrieved parties would otherwise be deprived of a meaningful and adequate means of vindicating their rights); *Heinl v. Godici*, 143 F. Supp. 2d 593, 599 (E.D. Va. 2001) ("a showing of irreparable harm may serve as an exception to the APA final agency action requirement"); *Sweet Life v. Dole*, 876 F.2d 402, 407 (5th Cir. 1989) ("A litigant may bypass formally outstanding administrative processes, for example, when there is no adequate administrative remedy, or when irreparable injury is likely to result absent immediate judicial review.") (internal citation and quotations omitted).

14

**III.    Plaintiffs are Likely to Succeed on the Merits of Their Claim**

      **A.    Plaintiffs' Claim is an As-Applied Claim, not a Facial Challenge.**

Defendants characterize Plaintiffs' claim as a facial challenge to Section 11 of the STOCK Act, which would require Plaintiffs to demonstrate that the statute could have no constitutional application.  *See* Opp. to PI at 21-22; MTD at 24-26.  But that is a straw man. Plaintiffs have already made clear that they do not contest the constitutionality of Section 11 in all its applications.  *See* Mot. to Extend TPI at 2 n.1 ("Plaintiffs do not represent such top officials [the President, the Vice President, Members of Congress, candidates for Congress, . . . cabinet secretaries and similar top government officials who are nominated for their positions by the President and confirmed by the Senate] and do not seek to enjoin application of the STOCK Act's publication requirement as to them.").

Rather, Plaintiffs contest Section 11's constitutionality as applied to themselves and others like them, *i.e.,* career executive branch employees who are not politically elected or appointed and who do not serve strictly at the pleasure of the voters or the President.  Plaintiffs' claim is therefore not a facial challenge to the Act.

      **B.    The Disclosure of Plaintiffs' Personal Financial Information Violates Their Constitutional Right to Privacy.**

            **1.    The Fourth Circuit recognizes a constitutional right to privacy in personal financial information**

As Plaintiffs previously demonstrated – and this Court found persuasive – the Fourth Circuit has long recognized a right to privacy in personal information, flowing from the Constitution.  *See* Mem. ISO PI at 17-20; Mem. Op. at 8-10.  In 1984, the Fourth Circuit stated, "[t]he right to privacy includes an individual[']s] interest in avoiding disclosure of personal

matters." *Taylor v. Best*, 746 F.2d 220, 225 (4th Cir. 1984) (internal citations and quotations omitted). It later reaffirmed the right, characterizing it as flowing from the Constitution. *See Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) ("Personal, private information in which an individual has a reasonable expectation of confidentiality is protected by one's constitutional right to privacy."). In *Walls*, the Fourth Circuit specifically recognized the constitutional right to privacy in financial information, such as debts and judgments. *Id*. at 194. As this Court recognized, (*see* Mem. Op. at 8), the Fourth Circuit's case law comports with the Supreme Court's assumption that there is a right to privacy in "avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599-602 (1977).

The Defendants fail in their attempt to dispute that this is the current state of the law. They cite *Edwards v. City of Goldsboro*, 178 F.3d 231, 252 (4th Cir. 1999) and *Condon v. Reno*, 155 F.3d 453, 464 (4th Cir. 1998), in support of their statement that "the Fourth Circuit has recognized that there is no general constitutional right to privacy." *See* MTD at 27; Opp. to PI at 23. But those panel decisions did not purport to overrule *Walls,* nor could they. Whether or not there is a "general" constitutional right to privacy, the Fourth Circuit in *Walls* specifically recognized that there is a constitutional right to privacy in personal financial information, and that remains the law in this Circuit.[8]

---

[8] Plaintiffs have already distinguished *Condon v. Reno*. Plaintiffs explained: "In 1998, the Fourth Circuit found that the constitutional right to informational privacy did not extend to a person's name, address, and telephone number, contained in state motor vehicle records, noting that 'this is the very sort of information to which individuals do not have a reasonable expectation of privacy,' and that 'the same type of information is available from numerous other sources.' *Condon v. Reno*, 155 F.3d 453, 464-65, rev'd on other grounds, 528 U.S. 141 (2000) (4th Cir. 1998). *Condon* is entirely distinguishable from this case." *See* Mem. ISO PI at 20 n.2.

The Government also cites Justice Scalia's concurring opinion in *NASA v. Nelson*, __ U.S. __, 131 S. Ct. 746, 764 (2011), to argue that a federal constitutional right to informational privacy does not exist, yet Justice Scalia's opinion was shared by only one other Justice.  The Government also cites Chief Judge Kozinski's dissent from denial of rehearing en banc in *Nelson v. NASA*, 568 F.3d 1028, 1052 (9th Cir. 2009).  Neither of these minority opinions can support Defendants' assertion of "the current state of the law."  *See* MTD at 27; Opp. to PI at 23.

Moreover, as Plaintiffs explained in their prior briefing, the majority opinion in *NASA* fully supports Plaintiff's position in this case.  The Court in *NASA* assumed that a constitutional right to informational privacy does exist.  *NASA*, 131 S. Ct. at 751; *see* Mem. ISO PI at 21 n.5. The Court went on to emphasize the importance of restrictions on disclosure in determining the government's ability to collect personal information.  Writing for the Court, Justice Alito listed the various Privacy Act limitations on disclosure of sensitive information regarding employee drug use and possession, and described these protections as giving "'forceful recognition' to a Government employee's interest in maintaining the 'confidentiality of sensitive information . . . in his personnel files,'" and as "'evidenc[ing] a proper concern' for individual privacy."  *NASA*, 131 S. Ct. at 762 (internal citations omitted).

The Government also relies on *AFGE v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786 (D.C. Cir. 1997), as an indicator of the current state of the law.  *See* MTD at 27; Opp. to PI at 24. First, this case is not from the Fourth Circuit.  Second, the D.C. Circuit recognized that "several of our sister circuits have concluded based on *Whalen* and *Nixon* that there is a constitutional right to privacy in the nondisclosure of personal information," but "declin[ed] to enter the fray" (*i.e.*, declined to join the Sixth Circuit, which it characterized as "alone among the courts of appeals").  *AFGE*, 118 F.3d at 792.  Third, while the opinion questioned the existence of a

17

constitutional right to privacy, it never concluded the right did not exist.  Finally, the court importantly emphasized the critical difference between the government's right to collect information and its right to publicly disclose that information.  *See id.* at 792-93.  The court was persuaded by the fact there were measures designed to protect the confidentiality of federal employees' answers to questionnaires, regarding, among other issues, financial information.  The importance of protection against disclosure, which was emphasized in both *NASA v. Nelson* and *AFGE*, was critical to the decision in *Walls* as well.[9]  These cases demonstrate the significance, in deciding the privacy issues before the Court, of the total absence of protection in Section 11.

Finally, the Government's citations to *Paul v. Davis*, 424 U.S. 693 (1976), and *O'Brien v. DiGrazia*, 544 F.2d 543 (1st Cir. 1976) are also unpersuasive.  Both decisions preceded the Supreme Court's decision in *Whalen* and the Fourth Circuit's decision in *Walls,* and both preceded *NASA v. Nelson* by 35 years.

The Government has also argued that, even if the Court accepts the fact that financial information is protected by a right to privacy, Plaintiffs' constitutional claim should still fail because "Plaintiffs certainly can have no reasonable expectation of privacy in the information submitted on OGE Form 278, which is, and for over thirty years has been, publicly available."

---

[9]  *See* Mem. ISO PI at 20-21, citing *Walls*, 895 F.2d at 194-95 (observing that Walls' information was "kept in a private filing cabinet that is locked at night, and only four persons [were] authorized to have access," but warning that, "if this type of information had been more widely distributed, our conclusions might have been different.  In the past few decades, technological advances have provided society with the ability to collect, store, organize, and recall vast amounts of information about individuals in sophisticated computer files.  This database capability is already being extensively used by the government, financial institutions and marketing research firms to track our travels, interests, preferences, habits, and associates.  Although some of this information can be useful and even necessary to maintain order and provide communication and convenience in a complex society, we need to be ever diligent to guard against misuse.  Some information still needs to be private, disclosed to the public only if the person voluntarily chooses to disclose it.").

403737580v1

*See* MTD at 29; Opp. to PI at 25.  This argument ignores the differences between the carefully limited public disclosure under the current regime and the uncontrolled, worldwide public disclosure that would result from implementation of Section 11 of the STOCK Act.  It also incorrectly assumes that limited public disclosure eviscerates privacy protection against much broader public disclosure.

The Government's argument – that the "changed *means*" of making information publicly available cannot have constitutional implications, (MTD at 29 and Opp. to PI at 26), ignores the latent structural constraints inherent in the current regime, including the time and effort it takes to request and obtain a filer's OGE Form 278.  Those constraints have, in effect, limited the number of OGE Form 278s requested by members of the public.[10]  *See* Harry Surden, *Structural Rights in Privacy*, 60 SMU L. Rev. 1605, 1614-15 (2007).  As Mr. Surden explains, "latent structural constraints," such as the time and effort associated with reviewing physical court records at a clerk's office, means that "a great deal of privacy is protected by structural, rather than legal, constraints."  *Id*.  These protections are subject to erosion with modern technology.

> *[A]side-effect of many emerging technologies is the elimination of structural privacy interests through cost reduction. The costs lost are those that previously acted as latent structural constraints - the activity costs that society was relying upon to constrain unwanted behaviors.* This dynamic - an emerging technology enabling previously impossible behavior - is a recurring pattern in the realm of privacy.

---

[10] As this Court has recognized, under the current regime, requests for Form 278s have been extremely limited.  *See* Mem. Op. at 11 (citing Proposed Collection; Comment Request for an Unmodified OGE Form 201 Ethics Act Access Form, 74 Fed. Reg. 59185, 59186 (Nov. 17, 2009)).  OGE estimated that an average of 450 requests would be filed per year for all Executive Branch employees across all Executive Branch agencies from 2010 to 2012.  74 Fed. Reg. 59186.  Significantly, "lower level officials' reports don't actually get requested."  Testimony of Walter M. Shaub, Jr. to be Director, Office of Government Ethics, *et al.*, Before the S. Comm. on Homeland Security and Governmental Affairs (July 20, 2012), *available at* http://www.hsgac.senate.gov/hearings/.  *See* Mem. ISO PI at 8.

*Id*. at 1618 (emphasis added).[11]

Courts have recognized that the existence of *some* public disclosure is in no sense fatal to a privacy claim.  In *United States Department of Justice v. Reporters Committee For Freedom of the Press*, 489 U.S. 749 (1989), the Supreme Court recognized a privacy interest in FBI rap sheets, noting that even though the information contained in them was public, "there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information," and concluding that "[t]he privacy interest in maintaining the practical obscurity of rap-sheet information will always be high." *Id*. at 764, 780.

Circuit courts, including the Fourth Circuit, have held the same.  *See Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010) (fact that individuals' Social Security numbers could be found in documents in county land records offices does not eviscerate their constitutional privacy interest in keeping their Social Security numbers off the Internet); *see also Bloch v. Ribar*, 156 F.3d 673, 686 (6th Cir. 1998) (plaintiffs, by disclosing some information related to a sexual assault, had not waived any right to prevent the publication of additional related information that they had not previously disclosed).

The government's argument also ignores the vast difference between the limited disclosure possible under the current regime and the lack of restrictions on disclosure that will necessarily result from Internet publication.  As explained in the Declaration of Christopher Soghoian (Exhibit D hereto), and discussed in detail below, there is simply no way to protect a

---

[11] *See also* Declaration of Christopher Soghoian (Exhibit D hereto) (discussing the same concept).

*public access* Internet website from being accessed anonymously by anyone who wishes to

misuse the data on the website, thereby nullifying the statutory strictures against misuse.

The notion that all that is happening here is a change in the *means* of access to otherwise

public information is analogous to saying that requiring an RSVP to an invitation for an event is

really no different than simply opening the doors and letting anyone in who shows up.

### 2.      Plaintiffs' privacy interests are not outweighed by any compelling government interest

Having established that the Plaintiffs' information is entitled to constitutional protection,

it follows that "the defendant has the burden to prove that a compelling governmental interest in

disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192.  The defendants

have not carried that burden.

### a.      The Government's alleged interests are either too broad or are disconnected to Plaintiffs, and are not compelling

The Government recites the general interests underlying the Ethics in Government Act,

for example, to "increase public confidence in the government," to "demonstrate the high level

of integrity of the vast majority of government officials," and to "better enable the public to

judge the performance of public officials," and asserts that they are compelling.  *See* MTD at 7;

Opp. to PI at 6 (quoting S. Rep. No. 95-170, 95th Cong., 1st Sess. 21-22 (1977)).  Courts have

likewise identified a wide variety of government interests that can be characterized in the

abstract as "compelling" – for example, protecting national security, *Haig v. Agee*, 453 U.S. 280,

307 (1981); "preventing crime," *United States v. Salerno*, 481 U.S. 739, 750 (1987); and

"protecting the physical and psychological well-being of minors," *Sable Commc'ns of Cal., Inc.

v. FCC*, 492 U.S. 115, 126 (1989).  But it obviously does not follow that every statute enacted

with the goals of protecting national security, preventing crime, or protecting minors is therefore constitutional, for those broad interests are not compelling in every possible application.  The interests proffered by the defendants are not compelling as applied here.

An earlier case arising under the Ethics in Government Act is highly instructive.  In 1989 Congress amended the Ethics in Government Act to prohibit federal employees from accepting outside compensation for making speeches or writing articles.  As in this case, individual federal employees and organizations representing them challenged the law as applied to them.  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ("*NTEU*").  Defending the law, the United States made almost identical arguments to those made here about the compelling nature of its interest in the integrity of the federal workforce.  *See id.* at 462 ("promoting the integrity of, and popular confidence in and respect for, the federal government," and "protecting the integrity and efficiency of public service and in avoiding even the appearance of impropriety created by abuse of the practice of receiving honoraria") (internal citation and quotations omitted).  But the Supreme Court found those interests not compelling "when neither the subject of the speech or article nor the person or group paying for it has any connection with the employee's official duties."  *Id*. at 457.  Thus, *NTEU* demonstrates, with regard to the very interests recited in this case, that interests that may be compelling at a high level of generality may not be compelling when applied in a specific context.

Other government employee privacy rights cases illustrate the same principle.  *See, e.g*. *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) ("Unlike most private citizens or *government employees in general*, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity.") (emphasis added); *Taylor v. O'Grady*, 888 F.2d 1189, 1196 (7th Cir. 1989) (a "*generalized interest* in the integrity of the

work force" insufficient to sustain urinalysis testing of certain administrative personnel) (emphasis added).[12]  These cases are particularly relevant here, where Plaintiffs are among a "large swath" of government employees subject to generalized "public integrity" rationales.  *See* Mem. Op. at 13.

Importantly, the broad governmental interests recited by Defendants were *not* the interests identified by Congress in extending the STOCK Act's Internet publication requirement to Executive Branch employees.  The very title of the STOCK Act states that it is "An Act To prohibit Members of Congress and employees of Congress from using nonpublic information derived from their official positions for personal benefit . . . ."  Pub L. No. 112-105, 126 Stat. 291.[13]  That stated purpose is consistent with the events motivating passage of the Act – that is, the "public impression that Members of Congress and staff were actually exempt or had 'excepted themselves' from the insider trading provisions."  Cong. Res. Serv. Rep. R42495 at 2, *available at* http://www.fas.org/sgp/crs/misc/R42495.pdf.  As discussed in the Statutory Background section, *supra*, the statements by Members of Congress relied upon by Defendants in support of their argument regarding the purpose of the Act were taken out of context and mischaracterized lawmakers' discussions as being applicable to both the executive and the legislative branches when they were not.

---

[12] *Taylor* further explains the rule above.

> The *Von Raab* Court . . . remanded that portion of the case dealing with the testing of employees with access to classified information because the class of employees tested was drawn too broadly. *This remand would be superfluous if all government employees could be subject to mandatory testing based on the integrity rational.* The governmental interest in the integrity of its work force, therefore, is not sufficiently strong to overcome the privacy interests of their employees.

*Id*. at 1196 (emphasis added) (citations omitted).

[13] One general interest the Act does mention with respect to federal employees includes the duty arising from "trust and confidence" of executive employees, which is expressly limited to a paragraph related to SEC prohibitions, and has nothing to do with online disclosure.  *See* Pub. L. No. 112-105, § 9(b), 126 Stat. 291.

403737580v1

Of course Plaintiffs are not Members of Congress or congressional staff.  As in *NTEU*,

the only evidence of abuses motivating the need for legislation appeared to be from

Congressmen themselves.  As a result, "[t]he limited evidence of actual or apparent impropriety

by Members of Congress" cannot reasonably be extended to Plaintiffs.  *See NTEU*, 513 U.S. at

456.

> **b.    Internet publication of career civil servants' financial disclosures is not narrowly tailored to advance the government's interests**

Internet publication of Plaintiffs' personal financial information is not a narrowly tailored

effort to advance the Government's interests and is, in fact, unnecessary to advance those

interests.  Plaintiffs are already subject to careful scrutiny of their financial affairs by agency

ethics officials, who are familiar with individual employee's duties and responsibilities in a way

that the general public is not.  And this scrutiny is backed up by the threat of criminal liability.

*See* Mem. ISO PI at 26-28.[14]  As the Supreme Court has observed, the fact "[t]hat the

Government's asserted interests are important in the abstract does not mean, however, that the

[challenged] rules will in fact advance those interests."  *Turner Broad. Sys., Inc. v. FCC*, 512

U.S. 622, 664 (1994).  Defendants have presented no facts to support their assumption that

---

[14] In this important respect, this case is entirely different from *Duplantier v. United States*, 606 F.2d 654 (5th Cir. 1979), where the court observed that "[w]hile nomination and confirmation procedures no doubt weed out certain persons who should not serve as federal judges, they do nothing to scrutinize the behavior of judges *once confirmed*." *Id.* at 671 (emphasis added).  Here, Plaintiffs and other executive branch employees are continually scrutinized during their employment. *See also* Kathleen Clark, *Do We Have Enough Ethics in Government Yet?: An Answer from Fiduciary Theory*, 1996 U. ILL. L. REV. 57, 91 (1996) (indicating that laws and regulations sufficiently "address the fiduciary concerns raised by executive branch employees' financial interests").

Internet publication will somehow materially improve the job now being done by agency ethics officials or the ethics of Executive Branch employees.[15]

To the contrary, it appears that the STOCK Act was extended to Plaintiffs simply for symbolic reasons (as Senator Shelby said, "what is good for the goose . . . should be good for the gander").  But symbolism is not a compelling interest for infringing on individual rights, and that ground for government action does not pass constitutional muster.  *See Chandler v. Miller*, 520 U.S. 305, 322 (1997) (striking down a Georgia statute that required candidates for public office to submit to drug testing on the ground that it improperly "diminishes personal privacy for a symbol's sake").

### c.     The foreseeable harm to Plaintiffs outweighs any benefit to the government

Finally, the magnitude of the foreseeable harm facing Plaintiffs far outweighs any benefit that might accrue to the government from Internet publication.  As this Court has already recognized:

> [T]he financial information the Act subjects to disclosure is quite sensitive. Furthermore, the data's publication portends substantial harm seeing that it stands to affect such a large swath of senior executives. The vehicle of disclosure, cyberspace, exacerbates these risks because it optimizes the accessibility and transferability of the information. Finally, the Act applies to many military, law enforcement, and diplomatic positions. As the senior security officials' letter highlights, these positions may be acutely vulnerable to the misuse of such financial information.

Mem. Op. at 13.  *See also* Mem. ISO PI at 3; Declaration of FBI Senior Intelligence Officer Kevin P. Logan, attached hereto as Exhibit E.  In Congress's extension of the Internet

---

[15] Moreover, OGE has admitted that the public has shown no interest in the disclosure forms: SES "reports don't actually get requested."  Testimony of Walter M. Shaub, Jr., *supra* 19 n.10.

403737580v1

publication deadline, it has expressly acknowledged the reality of these harms.  *See* S. 3510

pmbl. & S. 3625 pmbl. ("[t]o prevent harm to the national security or endangering the military

officers and civilian employees to whom the publication requirement applies").  Like the

"widespread impact" of the ban on payment for speeches and articles struck down in *NTEU*, the

damaging impact of online publication will be felt by many thousands of federal employees who

have done nothing wrong – and by their spouses and families.

Defendants rely heavily on *Duplantier* for the proposition that a court has already

decided that the harm from publication of financial data will not be great.  *See* MTD at 31; Opp.

to PI at 28.  But the Pre-STOCK Act Ethics in Government Act, the statute at issue in

*Duplantier*, merely required federal judges to report the same information as in Form 278.[16]

That 1979 case could not have considered the "Pandora's box" of "perils of the Information

Age," (Mem. Op. at 15), that did not exist thirty years ago.  *Duplantier* is inapposite.

Nor do Plaintiffs' privacy interests evaporate because they are "high-level" employees

who have "chosen" government employment, as Defendants suggest.  *See* MTD at 33; Opp. to PI

at 30.  Plaintiffs here are not elected officials, presidentially appointed agency heads, or federal

judges, all of whom are constitutionally and traditionally subject to democratic scrutiny, either

via elections, congressional confirmation, or removal by Congress or the President.  *See* U.S.

Const. art. I, § 2, art. II, §§ 1, 2, 4.[17]  Plaintiffs are, or represent, approximately 28,000

---

[16] Indeed, federal judges have been given protections not available to Executive Branch employees, such
as notifying the judge of each request.  *See, e.g.,* Administrator's Office of the U.S. Courts, Filing
Instructions for Judicial Officers and Employees, *Security Issues* (2010).

[17] *See* Kathleen Clark, *Do We Have Enough Ethics in Government Yet?: An Answer from Fiduciary
Theory*, 1996 U. ILL. L. REV.  57, 91 n.171 (1996) (noting "Members must stand for reelection on a
regular basis and are already subject to financial disclosure obligations. . . . The press sometimes
investigates the connection between these financial interests and members' votes. . . . Therefore, a

government employees.  The criteria for inclusion in the Senior Executive Service demonstrate as much: an employee qualifies for SES designation if he or she has any serious supervisory responsibility, *e.g.,* "direct[ing] the work of an organizational unit," being "held accountable for the success of one or more specific programs or projects," or "supervis[ing] the work of employees other than personal assistants."  5 U.S.C. § 3132(a)(2).  While federal judges are "not ordinary citizens," (*Duplantier,* 606 F.2d at 670), Plaintiffs are more like "government employees in general" *(Von Raab*, 489 U.S. at 672).[18]  As in *NTEU* and the urinalysis cases discussed above, the "governmental interest in the integrity of its work force . . . is not sufficiently strong to overcome the privacy interests of [its] employees."  *Taylor*, 888 F.2d at 1196.

Because Defendants cannot meet their substantial burden of showing that Internet publication of Plaintiffs' personal financial information is narrowly tailored to serve a compelling government interest, Internet publication is unconstitutional and should be enjoined.

>           **3.      There are no safeguards that can protect public access websites
>                   from anonymous browsing**

The STOCK Act eradicated many of the most important safeguards that were essential to protecting employees' privacy under the EGA.  Defendants claim that the STOCK Act merely took away the EGA's "written application" requirement, replaced it with a "login protocol"

---

member's constituents are in a position to judge for themselves whether the member has violated the public's trust.").

[18] Plaintiffs' rights are therefore not "circumscribed" like the appointed or elected officials in Defendants' cases, where the reasoning depended on that status.  *See Duplantier*, 606 F.2d at 670 ("Regardless of whether a public official is *elected or appointed* to office, his or her legitimate expectation of privacy is necessarily circumscribed.") (emphasis added); *Plante v. Gonzalez*, 575 F.2d 1119, 1136 (5th Cir. 1978) ("mandatory financial disclosure for *elected* officials is constitutional") (emphasis added).

27

requirement for Internet access, and left all other statutory safeguards in place. *See* MTD at 37; Opp. to PI at 33-34. But that is not the case.

It is important to distinguish between (a) Section 11(a) of the STOCK Act, pursuant to which executive branch agencies are currently required to publish on their websites, by December 8, 2012, the personal financial disclosure reports of the thousands of covered executive branch employees and (b) Section 11(b) of the STOCK Act, pursuant to which OGE is required to develop by 2013 a centralized electronic database that allows the public to search, sort, and download data contained in such reports.

### a. The December 8 Agency Publications

As to this mass, multi-agency publication – which is the publication to which a preliminary injunction will immediately apply – the *only* access-related provision of the statute is the provision that "section 105(b)(2) of the [EGA] does not apply." Pub. L. No. 112-105, § 11(b)(2), 126 Stat. 291. This provision eliminates not only the written request requirement but much more as well.

Other protections under the pre-STOCK Act regime for access to records held by agencies are gone. Under Section 105(b)(2) of the EGA, a person who wished to view or obtain an employee's Form 278 had to submit an application in writing to the relevant agency, with the requestor's name, occupation, and address; the name and address of any other person or organization on whose behalf the requestor was making the request; an affirmation that the requestor was aware of the prohibitions on obtaining or using the report; and an agreement by the requestor – acknowledged by his or her signature – to abide by those prohibitions. 5 U.S.C. App'x § 105(b)(2). The requesting individual had to furnish legitimate contact information in

28

order to receive the requested form(s) by mail or else appear in person at the agency to obtain the form(s).  The new proposed Form 201-A, even assuming it is given emergency approval by the Office of Management and Budget, is not comparable to these protections, as explained below.

An additional important safeguard that has been lost is the requirement in Section 105(b)(2) of the EGA that a requestor's application for a financial report also be made available to the public.  5 U.S.C. App'x § 105(b)(2)(c).  Thus, before the STOCK Act, federal employees whose OGE Form 278s had been requested, as well as the public, could learn who had asked for financial information.  After the STOCK Act, the requestor does not face this public scrutiny (and deterrence).

### b.      The OGE Database Disclosures

As to the disclosures to be made available via the OGE database, Defendants' assertion that they will not easily be subject to abuse relies largely on the fact that the database will require a "login protocol with the name of the user" for downloading the data.  Pub. L. No. 112-105, § 11(b)(2), 126 Stat. 291.  What Defendants fail to mention, however, is that OGE is expressly prohibited from requiring any sort of login for public users accessing, sorting, and viewing the same data: "[n]o login shall be required to *search* or *sort* the data contained in the reports made available by this subsection."  *Id.* (emphasis added).  This information will therefore be fully available to any Internet user without the need to log in.  Even the login requirement, applicable only to downloading, provides no real protection, because the data can still be easily moved from the database to a user's computer by means of screenshots, which are easily created on any computer.  *See* http://en.wikipedia.org/wiki/Screenshot.

c.     **OGE's Wholly Ineffective Internet Access Form**

OGE's recently-proposed Internet access request Form 201-A, (*see* 77 Fed. Reg. 66075-76 (Nov. 1, 2012)) (presumably to be used in connection with agency disclosures on December 8), provides only the illusion of security and offers no actual protection against anonymous access.  This procedure would allow anyone to access online financial data by providing a name, city, state, and country, but there is no way to authenticate the information provided by the user.

As explained in the Declaration of Christopher Soghoian, attached hereto as Exhibit D, the OGE's proposed form and process cannot reliably obtain accurate information about, or determine the identity of, a person accessing the website.  Exhibit D at ¶ 6.  A requester seeking anonymity could easily supply either a fictitious name or the name of an actual, random third party.  *Id.*  One could also download records from the OGE website in a manner that shielded one's true identity and location, including one's IP address, frustrating later investigation by authorities.  *Id.* at ¶ 7.  Individuals lacking technical skills could do this simply by connecting to the OGE website from an open wireless network, such as at a coffee shop or public library.  More technically savvy users could achieve an even higher degree of anonymity by using an anonymizing network service or one of the many virtual private network providers that do not maintain logs.  *Id.*  Users could do this from anywhere in the world while making it appear as though they were accessing agency websites from specific locations within the United States.  *Id.*  Even if Form 201-A is implemented, the agency publications on December 8 will not only cause the loss of Plaintiffs' privacy rights but will subject them to misuse of that information by unidentifiable Internet users from around the world.

Courts have recognized that even a known IP address cannot adequately establish the identity of a specific individual, (*see Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 262 (S.D.N.Y. 2008)), and that the ability to access Internet data anonymously is a security problem. *See*, *e.g.*, *Cobell v. Norton*, No. 1:96CV01285(RC), 2001 WL 1555296, at *23 (D.D.C. Dec. 6, 2001) (government contractor hired to assess and evaluate a federal agency's IT security system described as problematic the ability to log in anonymously or to sign in as someone else).[19]

Government computer access guidelines applicable in other contexts emphasize that the flaw in OGE's proposed request form is the government's inability to authenticate the information submitted by the user. Executive agencies are generally directed by guidelines promulgated by the National Institute of Standards and Technology ("NIST"). *Cobell*, 2007 WL 1555296, at *7. One such set of guidelines, NIST Special Publication 800-14, demonstrates that secure computer information access depends not only on user identification, but also on user authentication:

> Identification and Authentication is a critical building block of computer security since it is the basis for most types of access control and for establishing user accountability.[20] Identification and Authentication is a technical measure that prevents unauthorized people (or unauthorized processes) from entering an IT system. Access control usually requires that the system be able to identify and differentiate among users.

---

[19] There are also other case law examples describing unauthorized access to computer records by using falsified login information or by hijacking real usernames and passwords to log into systems and download information. *See*, *e.g.*, *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1298 (C.D. Cal. 2007) (hijacking members' usernames and passwords to download information); *Facebook, Inc. v. ConnectU LLC*, No. C 07-01389 RS, 2007 U.S. Dist. LEXIS 61962, at *6 (N.D. Cal. Aug. 13, 2007) (using falsified login information to gain access).

[20] A footnote in the quoted text recognizes that identification and access control is not required for all types of access.

NIST Special Publication 800-14, Generally Accepted Principles and Practices for Securing

Information Technology Systems (Sept. 1996) at 43.[21]

"Identification is the means by which a user *provides* a claimed identity to the system."

*Id.* (emphasis in original).  For example, a user's "name, city, state and country" provided in

response to the OGE's proposed Internet access request form is an example of identification.

Authentication, on the other hand, "is the means of establishing the *validity* of this claim."  *Id.* at

44 (emphasis in original).  The government's proposed Form 201-A lacks any type of

authentication or ability to prove the validity of the identifying information submitted by a user,

thus making it no more useful than if it did not exist at all.

> **C.**      **The STOCK Act's Internet Posting Requirement Cannot Be Applied to Executive Branch Filers Who Submitted Their Form 278s Prior to Passage of the STOCK Act.**

Congress intended the STOCK Act to apply only to financial disclosures filed after the

enactment of the statute.  Statutory construction favors such prospective application, and clear

statutory language is required to overcome the presumption against statutory retroactivity.  *Ward*

*v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 172 (4th Cir. 2010).  "[A] requirement that Congress

first make its intention clear helps ensure that Congress itself has determined that the benefits of

retroactivity outweigh the potential for disruption or unfairness."  *Landgraf v. USI Film Prods.*,

511 U.S. 244, 268 (1994).

It is not clear in this case that Congress considered such unfairness, or intended the

STOCK Act to apply retroactively.  In fact, the statutory language supports prospective

---

[21] *Available at* http://csrc.nist.gov/publications/nistpubs/800-14/800-14.pdf.

application only: "[n]ot later than August 31, 2012, or 90 days after the date of enactment of this

Act, whichever is later," financial disclosure forms filed "in calendar year 2012 and in

subsequent years" must be made available on agency websites "not later than 30 days after such

forms are filed."  Pub. L. No. 112-105, § 11(a)(1), 126 Stat. 291.

It would be literally impossible to apply this publication requirement to any filings made

prior to the enactment of the STOCK Act.  For example, some of the pre-STOCK Act filings in

2012 were made more than 200 days prior to the August 31, 2012, date for initial publication, yet

the STOCK Act calls for their publication "not later than 30 days after such forms are filed."

Defendants' exclusive focus on words "calendar year 2012" fails to place those words in context

with the rest of the sentence, and does not address the fact that it would be impossible to publish

pre-April 4, 2012 filings "not later than 30 days after such forms are filed."[22]

Plaintiffs also described in prior briefing the Due Process violations that would arise

should the STOCK Act be applied retroactively to financial disclosures filed prior to the statute's

passage.  *See* Mem. ISO PI at 28-31.  Such a retroactive application would take away Privacy

Act and EGA Section 105(b) protections covering the disclosures that were in effect when the

disclosures were made, and would therefore disrupt the settled expectations under which pre-

enactment filers prepared and submitted their forms.  *See Landgraf,* 511 U.S. at 265

("Elementary considerations of fairness dictate that individuals should have an opportunity to

---

[22] In its purported attempt to implement the STOCK Act's website publication requirement, OGE did not expressly apply a calendar year 2012 limitation to those financial disclosures it intends to post.  Instead, OGE sought "to disclose on the OGE Web site and to otherwise disclose to any person . . . any public filer reports required to be filed by reason of Federal employment or by the president or vice president."  Privacy Act of 1974; Amendment to System of Records, 77 Fed. Reg. 45353 (July 31, 2012).  As written, this notice would permit OGE to publish Form 278 information going back to 2006, even though many of those forms contain information from individuals who have long since left government employment.

know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.") (footnote omitted).  Defendants have also failed to offer any adequate justification for applying the Internet publication requirement of the STOCK Act to Executive Branch employees who filed Form 278s prior to the enactment of the STOCK Act.  *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976) (Fifth Amendment protects against retroactive legislation that is arbitrary or irrational, and a justification adequate for prospective legislation might be insufficient to satisfy due process for retroactive aspects of the legislation); *E. Enters. v. Apfel*, 524 U.S. 498, 549 (1998) (Kennedy, J., concurring) (concurring opinion would have invalidated statute on due process grounds as it "bears no legitimate relation to the interest which the Government asserts in support of the statute").

In their Due Process/retroactivity arguments, Defendants maintain that the STOCK Act "does not carry any new legal consequences that did not exist before the STOCK Act's enactment," (*see* MTD at 44; Opp. to PI at 40), but they fail to address the fact that previously applicable Privacy Act protections have been eliminated by the STOCK Act.  Notwithstanding Defendants' arguments to the contrary, the STOCK Act eliminated significant Privacy Act protections.  Under the Privacy Act, when an agency asks an individual to supply information, it must inform the individual of the authority that authorizes the solicitation of information, the principal purpose for which the information is to be used, and the routine uses that may be made of the information.  5 U.S.C. § 552a(e)(3).  An agency is prohibited from disclosing the information except pursuant to prior written consent, a routine use, or other listed exceptions not applicable here.  *Id.* at § 552a(b).  The STOCK Act, if made applicable to pre-enactment filers, would permit an agency to disclose the information beyond the filer's consent and without any established routine use.

The only consent given by Form 278 filers prior to enactment of the STOCK Act was for disclosure "upon request *to any requesting person pursuant to section 105 of the [Ethics in Government] Act* or as otherwise authorized by law." Form 278, Rev. 12/2011 at 11, Doc. No. 3-3 (emphasis added). In other words, filers only consented to disclosures that complied with the procedures and protections of EGA Section 105 at the time. These included not only the guarantee that requestors submit legitimate contact information, but also that Form 278 filers could have learned who had asked for their information. 5 U.S.C. App'x § 105(b)(2). The Privacy Act provided a similar, independent layer of protection for those who filed Form 278s prior to passage of the STOCK Act. For most authorized Privacy Act disclosures, including those made pursuant to a routine use, an agency must keep and retain "the date, nature, and purpose of each disclosure" and "the name and address of the person or agency to whom the disclosure is made." 5 U.S.C. § 552a(c). These protections do not apply under the Internet publication provisions of Section 11 of the STOCK Act. In other words, these are not just "means" of publication, but real protections that no longer exist.

Defendants argue that the inclusion of the phrase, "or as otherwise authorized by law," in the Privacy Act disclosure on Form 278 renders the rest of the disclosure essentially meaningless, since this language permits the law to be changed after personal information has been disclosed. But such an interpretation guts the purpose of the Privacy Act and its detailed disclosure provisions. 5 U.S.C. § 552a(b)-(f). Read in the context of the Form 278 Privacy Act statement, and in the context of the entire sentence ("upon request to any requesting person pursuant to section 105 of the [Ethics in Government] Act or as otherwise authorized by law"), the only reasonable interpretation is that "as otherwise authorized by law" means as otherwise authorized by the permissible disclosures, conditions, and exceptions of the Privacy Act.

35

**IV.      Plaintiffs Will Suffer Irreparable Harm When Section 11 Becomes Effective**

As discussed in Plaintiffs' standing argument, *supra* at 9-13, and in their Memorandum of Points and Authorities in Support of their Motion for Preliminary Injunction, Plaintiffs have demonstrated that the irreparable injury of Internet publication itself, *i.e.*, a denial of a constitutional right, is "actual and imminent."  Absent injunctive relief by this Court, the Plaintiffs' rights to privacy in the personal financial information they have submitted will be lost forever.

Plaintiffs have already explained the ways in which they or their colleagues will be harmed as a result of Internet publication.  *See* Mem. ISO PI at 34-38.  In addition, new Plaintiff Kevin Logan, a Senior Intelligence Officer at the FBI, voices his concern that the publication of his personal financial information on the Internet will enable intelligence services in other countries to obtain the information and use it for exploitation.  *See* Logan Decl. at ¶ 9.  He takes steps to protect his anonymity and to safeguard personal and public information available to the public, and does not wish to see that anonymity threatened, as would surely result from Internet publication.  *Id*. at ¶ 11.

Defendants' response is that nothing has changed, as Form 278s have been available to members of the public for thirty years.  But we have explained above and in our earlier filings why the "nothing has changed" argument represents the view of an ostrich with its head in the sand, unable to see the massive change that the Internet has created regarding access to information.

**V.     The Balance of Harms and the Public Interest Weigh in Favor of Entry of a Preliminary Injunction**

As in prior briefing, Plaintiffs again refer this Court to the test employed in determining whether there has been a violation of the right to privacy, *supra*, at 21-27.  Absent a preliminary injunction, Plaintiffs will suffer a damaging and irretrievable loss of their personal financial data. Conversely, if an injunction is granted, the government will simply be required to maintain the status quo pending a decision on the merits or congressional action to fix the problem, including continuing to allow for public access under the procedures that have been in effect until now.

**VI.     A Preliminary Injunction is in the Public Interest**

"[U]pholding constitutional rights is in the public interest."  *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011).  Here, again, there is also a compelling public interest in delaying an irreversible action in order to allow Congress an opportunity to fully review the National Academy of Public Administration's study and report containing findings and recommendations related to Section 11, which mandated by Congress and involves review of precisely the issues raised by this lawsuit.  *See* Mot. to Extend TPI.

<u>**CONCLUSION**</u>

For all of the reasons stated above, this Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for a Preliminary Injunction.

403737580v1

Dated: November 13, 2012                  Respectfully Submitted,


/s/ Daron T. Carreiro
Jack McKay (D. Md. Bar No. 05628)
Thomas G. Allen
Daron T. Carreiro (D. Md. Bar No. 18075)
Kristen E. Baker
Benjamin J. Cote
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC 20037
Office:  (202) 663-8000
Fax:  (202) 663-8007
Email: jack.mckay@pillsburylaw.com
         thomas.allen@pillsburylaw.com
         daron.carreiro@pillsburylaw.com
         kristen.baker@pillsburylaw.com
         benjamin.cote@pillsburylaw.com


/s/ Arthur B. Spitzer
Arthur B. Spitzer (D. Md. Bar No. 08628)
American Civil Liberties Union of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
Office:  (202) 457-0800
Fax:  (202) 457-0805
Email: art@aclu-nca.org


*Counsel for Plaintiffs*