# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SENIOR EXECUTIVES
  ASSOCIATION, *et al.*,

              Plaintiffs,

  v.

UNITED STATES, *et al.*,

              Defendants.

No. 8:12-cv-2297-AW

**DECLARATION OF CHRISTOPHER SOGHOIAN**

Christopher Soghoian deposes and says:

1. I am the principal technologist and a senior policy analyst with the Speech, Privacy and Technology Project at the American Civil Liberties Union. I completed my Ph.D. in Informatics at Indiana University in 2012, my M.S. in Security Informatics at The Johns Hopkins University in 2004, and my B.S. in Computer Science at Johns Hopkins University in 2002. Between 2009 and 2010, I was the first in-house technologist in the Federal Trade Commission's Division of Privacy and Identity protection. In that role, I assisted with several FTC investigations, including investigations of Facebook, Twitter, MySpace and Netflix.

2. I understand that the Stop Trading on Congressional Knowledge ("STOCK") Act, enacted by Congress earlier this year, requires that the information contained in personal financial disclosure forms filed by many federal employees must be posted on the Internet in a publicly accessible manner. I have been informed by counsel for the plaintiffs in this lawsuit that the defendants have stated in recent court papers that the Office of Government Ethics (OGE) "was not stripped of its regulatory authority to

establish procedures for the public availability of financial statements. Indeed, pursuant to its regulatory discretion, OGE plans to address the manner in which the OGE Form 278s will be made available online to the public pursuant to Section 11(a)" of the STOCK Act.

    3.  I am aware that the Office of Government Ethics currently provides public access to the personal financial disclosure reports of a small number of presidential appointees confirmed by the Senate on an automated, web-based application located at http://www.oge.gov/Open-Government/Access-Records/Current-Executive-Branch-Nominations-and-Appointments/.   I have accessed that application, and I am aware that visitors to that website seeking access to financial disclosure reports are required to enter their name, city, state, country and occupation.

    4.  I have reviewed an "emergency clearance notice and request for agency and public comments" that was published by the Office of Government Ethics at 77 Fed. Reg. 66075 on November 1, 2012.  That notice seeks "expedited emergency clearance" from the Office of Management and Budget for OGE's use of a new Form 201-A, an Internet form that would require persons seeking access to financial disclosure reports online to provide their name and their city, state and country of residence.  That appears to be the manner in which OGE "plans to address the manner in which the OGE Form 278s will be made available online." That would be quite similar to the manner in which access to the personal financial disclosure reports of presidential appointees referred to in Paragraph 3, above, is obtained.

    5.  I understand, from reading the comments submitted in response to this Federal Register notice by the Senior Executives Association, that the existing system for

accessing paper copies of federal employees' financial disclosure reports requires a requester to fill out a Form 201, providing identifying information, designating the purpose of the request, specifying up to six individuals whose financial disclosure forms are being requested, and designating whether the requestor wishes to receive the information by mail or by picking it up in person.  Requestors must also certify via signature that they understand the applicable laws governing use or misuse of the information, and the penalties for misuse.  The built-in delay in responding to a written request and mailing the financial disclosure reports, or making them available for in-person pickup, also provides the possibility of investigating the authenticity of a requester's identity and location before providing the requested information.  The limitation of requesting only six records at a time also protects against the misuse of large numbers of records.  Multiple requests for large numbers of records from the same requester at the same time could prompt an inquiry into the requester's *bona fides*.  The inherently high transaction costs present in the paper-based system are a latent structural constraint that protect against the large scale abuse of records in this database.[1]  By

---

[1] *See* Harry Surden, *Structural Rights in Privacy*, 60 SMU L. Rev. 1605, 1605 (2007) ("Latent structural constraints . . . are the secondary costs arising from the technological state of the world which implicitly regulate conduct by making certain activities too difficult to engage in on a widespread basis. Society relies upon these latent structural constraints to reliably inhibit certain unwanted conduct in a way that is functionally comparable to its use of law.").  Mr. Surden provides an example that will be familiar to the Court: "private information—social security numbers and financial data—appearing within public documents, such as the records of court proceedings." *Id*. at 1613.  As he explains:

> Traditionally, what would have protected such interests would have been latent structural constraints, rather than legal constraints. A typical court case can generate hundreds or thousands of individual documents. Each of these documents within the public record can be tens or hundreds of pages in length. In the not-too-recent past, these documents were not available electronically. The act of finding a particular piece of

3

contrast, the Internet based system offers few, if any structural safeguards.

  6. The form and process that OGE now uses on the website mentioned above, and that it apparently plans to use more broadly, cannot reliably obtain accurate information about, or determine the identity or location of, a person accessing the website. It would be easy for a requester seeking anonymity to supply either a fictitious name or the name of an actual, random third party found by flipping through a telephone book. The latter technique would likely defeat any attempt to verify, in real time, that the requester was a real person.

  7. If someone wished to download records from an OGE website in a manner that shielded their true identity and location it would be easy for them to hide their computer's actual IP address, and thus frustrate later investigation by the authorities. Even

---

> information in a public record would have required a physical visit to the public records office, followed by multiple requests to a records clerk for large physical files. This would have been followed by a labor-intensive search for particular words through thousands of pages of documents. Although it was not impossible to conduct such a search, the costs involved effectively constrained such searching behavior for most widespread, privacy-protecting purposes. Frequent, arbitrary, and widespread searches of this nature were too costly to occur on a regular basis.
>
>  In this example, the privacy interest—the freedom from having others glean sensitive personal information from public records—was adequately protected by latent structural constraints. Society relied upon an alternative regulatory mechanism—structure—to constrain the behavior as a substitute for what could have been explicitly regulated by law. Note that with the advent of electronically searchable court documents available on public websites, the structural privacy rights calculus changed.

*Id*. at 1613-14. As the Court is aware, that structural change led directly to a legal change, with federal courts now requiring the redaction of such information from public filings. *See, e.g.,* United States District Court for the District of Maryland, *Privacy Policy - Civil Cases (other than Social Security Appeals)* (1994) (*available at* http://www.mdd.uscourts.gov/localrules/localrules.html) ("Social Security numbers, financial account numbers, dates of birth and names of minor children not parties to a case are personal identifiers which unless otherwise ordered by the court should not appear in public court documents except as is set out below.").

4

individuals lacking technical skills can do this simply by connecting to the website from an open wireless network, such as at a coffee shop or public library.  More technically savvy users can achieve a higher degree of anonymity even from their home or office by using an anonymizing networking service, such as the Tor Project,[2] or one of many commercial Virtual Private Network (VPN) providers that do not maintain logs.  When someone browses the web using Tor or another VPN, their Internet traffic appears to originate at the Tor or VPN server, rather than from their home connection.[3]  Thus, a U.S. citizen located in Chicago who uses a Tor exit server in France will appear to be a user in France.  Likewise, someone in Iran connecting to the web via a Tor exit server located in San Francisco will appear to be a web surfer from San Francisco.

      8.  On November 6, 2012, I used the OGE website to request the Public Financial Disclosure Report (Form 278) for James Clapper, the Director of National Intelligence.  During the automated, Web-based download process, I entered valid, true information in the name, city, state, country and occupation fields.  However, I used a privacy-preserving VPN service (Riseup.net), which keeps no logs about its users' activities.  Therefore, even if OGE retains the IP addresses of visitors requesting financial disclosure

---

[2] The Tor Project is an anonymizing network that provides censorship- and surveillance-resistant Internet connectivity to activists, journalists, researchers and privacy advocates around the world. There are an estimated 500,000 users of Tor. These include law enforcement and intelligence agencies in the United States, which was the intention of the US Naval Research Lab, which invented the underlying technology and funded the early development of the project. Tor is also used by activists, journalists and the general public in Iran, Syria, China and other countries with authoritarian governments, which has led to significant funding for Tor from the U.S. State Department and the Broadcasting Board of Governors (the entity responsible for U.S. Government and government-sponsored, non-military, international broadcasting). It is estimated that approximately 15% – about 75,000 – of Tor's users are located in the United States.

[3] See Marketa Trimble, The Future of Cybertravel: Legal Implications of the Evasion of Geolocation, 22 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 567 (2012).

forms, the IP address in the logs associated with that particular download of Director Clapper's financial disclosure forms will be an IP address associated with Riseup's VPN server in New York, and not the ACLU office in Washington, DC.  Thus, if I had entered false information about myself, OGE would have no way of determining who or where I was, and no way of enforcing any prohibitions on improper use of Director Clapper's personal financial information.

      9.  In brief, the identification requirement of OGE's Web-based application is security theatre. There is nothing in it that could stop a criminal or other malicious party from entering false information, hiding their tracks, and downloading whatever financial disclosure forms they desire.

      I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

      Executed this 12th day of November, 2012.

      /s/ *Christopher Soghoian*
      _____
      Christopher Soghoian, Ph.D.