IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| SENIOR EXECUTIVES ASSOCIATION et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 8:12-cv-02297-AW |
| UNITED STATES OF AMERICA et al., | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiffs Senior Executives Association et al. bring this action against Defendants United States of America and Don W. Fox, Acting Director of the Office of Government Ethics. Plaintiffs assert the following claims: (1) violation of the constitutional right to privacy; (2) violation of due process; (3) violation of the Administrative Procedure Act (APA); and (4) declaratory relief. Defendants' Motion to Dismiss the Amended Complaint is outstanding. The Court has carefully reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss the Amended Complaint.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case presents a challenge to the Stop Trading on Congressional Knowledge Act of 2012 (STOCK Act), Pub. L. No. 112-105, 126 Stat. 291 (2012). As originally proposed, the STOCK Act (Act) sought to prevent members and employees of Congress from trading on the basis of nonpublic information acquired through such positions. *See* 15 U.S.C. § 78u-1(g)(1). The Act aims to achieve this objective partly through a system of liberal public disclosure of

1

certain financial information of congressional members and employees. *See* 5 U.S.C. app. 4 § 103. Under the Act,

> The required public financial disclosure report requests information about the filer's interests in property; sources of earned income and investment income; gifts and reimbursements; purchases; sales, and exchanges of investments; liabilities; positions with entities outside the federal government; agreements and arrangements for employment; and continued participation in employee benefit plans.

Mem. Supp. Gov.'s Mot. Dismiss 6 (Mot. Dismiss), Doc. No. 39-1 (citing 5 U.S.C. app. 4 § 102). The Senate amended the Act before its passage, thereby making its financial data disclosure demands applicable to certain senior executive officials and other high-level executives, including some military members. *See* 158 Cong. Rec. S297, S301 (daily ed. Feb. 2, 2012).

The Act is not the first financial disclosure scheme applicable to executive branch officials. For decades, senior executives have had to file financial disclosure reports under the Ethics in Government Act (EGA), 5 U.S.C. app. 4 §§ 101 *et seq.* Affected executives must annually file their financial disclosure reports on forms that the Office of Government Ethics (OGE) issues. OGE Form 278 is the latest version of the financial disclosure form. *See* Proposed Collection; Comment Request for an Unmodified OGE Form 201 Ethics Act Access Form, 74 Fed. Reg. 59185, 59186 (Nov. 17, 2009). Form 278—in connection with the EGA and its implementing regulations—generally compels the disclosure of the financial information set forth in the preceding block quotation. *See supra*; *see also* 5 C.F.R. §§ 2634.301–.311.

The OGE, pursuant to statutory mandate, has developed procedures to access Form 278s. *See* 5 U.S.C. app. 4 § 402(b). In essence, to access Form 278s, requesters must satisfactorily complete OGE Form 201. Form 201 apprises the requester of certain barriers to disclosure that the EGA establishes. *See* 5 U.S.C. app. 4 § 105(b)(2). For instance, Form 201 "requests the requester's name, address, office telephone number, occupation, the name and address of the person or organization on whose behalf the request is made (if applicable), the type of requester . . . , and signature." Mot. Dismiss 8, Doc. No. 39-1 (citation omitted). Furthermore, Form 201s state unlawful uses of Form 278s and require acknowledgement that, in addition to any other remedy available under statutory or common law, the Attorney General may bring a civil action against persons who obtain or use Form 278s for prohibited purposes. *Id.* at 8–9 (citation omitted).

Restrictions external to the EGA and its implementing regulations serve as barriers to the disclosure of Form 278s. Historically, Form 278s have been subject to the strictures of the Privacy Act, which, with various exceptions, prohibits federal agencies from disclosing certain personal information. *Compare* 5 U.S.C. § 552(a), *with* Doc. No. 3-3. One such exception involves "routine use." The Privacy Act defines routine use as "use of [a] record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). Generally, routine uses qualify as exceptions to the Privacy Act's prohibition against the disclosure of financial records absent prior written consent. *See id.*; 5 U.S.C. § 552a(e)(3)(C); *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 362 (D.C. Cir. 2005) (noting that routine uses may include otherwise protected information necessary for an agency to perform its functions under a statute).

3

Section 11 of the Act, both directly and indirectly, erodes some of these barriers. For instance, section 11 renders section 105(b)(2) of the EGA inapplicable to its provisions mandating Internet publication of Form 278s. *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting). Similarly, in an apparent attempt to implement section 11's Internet publication prescription, the OGE has announced modifications to its list of routine uses. This regulatory change broadly permits the OGE "to disclose on the OGE Web site and to otherwise disclose to any person . . . any public filer reports required to be filed by reason of Federal employment or by the president or vice president." *See* Privacy Act of 1974; Amendment to System of Records, 77 Fed. Reg. 45353 (July 31, 2012).

The Act's disclosure regime differs from the EGA's in other material respects. The Act contemplates nearly contemporaneous reporting of certain securities transactions. *See* 5 U.S.C. app. 4 § 103(l). Furthermore, in addition to its Internet publication prescription, section 11(b) of the Act mandates the creation of a searchable database to facilitate public access to the financial data subject to disclosure. *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting).

On July 19, 2012, a group of high-ranking former federal officials in law enforcement, diplomatic, and national security positions wrote congressional leaders a letter detailing dangers that, in their opinion, the Act threatens. The Court reproduces the pertinent portion of the letter in the subsequent space:

> We believe that this new uncontrolled disclosure scheme for executive branch officials will create significant threats to the national security and to the personal safety and financial security of executive branch officials and their families, especially career employees. Placing complete personal financial information of all senior officials on the Internet would be a jackpot for enemies of the United States intent on finding security vulnerabilities they can exploit. SF-278 forms include a treasure trove of personal financial information: the location and value of employees' savings and checking accounts and certificates of deposit; a full valuation and listing of their investment portfolio; a listing of real estate assets and their value; a listing of debts, debt amounts, and creditors; and

the signatures of the filers. SF-278s include financial information not only about the filing employee, but also about the employee's spouse and dependent children.

Posting this detailed financial information on the Internet will jeopardize the safety of executive branch officials — including military, diplomatic, law enforcement, and potentially intelligence officials — and their families who are posted or travel in dangerous areas, especially in certain countries in Asia, Africa, and Latin America. Embassy and military security officers already advise these officials to post no personal identifying information on the Internet. Publishing the financial assets of these officials will allow foreign governments, and terrorist or criminal groups to specifically target these officials or their families for kidnapping, harassment, manipulation of financial assets, and other abuse.

Equally important, the detailed personal financial information — particularly detailed information about debts and creditors — contained in the SF-278s of senior officials is precisely the information that foreign intelligence services and other adversaries spend billions of dollars every year to uncover as they look for information that can be used to harass, intimidate and blackmail those in the government with access to classified information. Yet under the STOCK Act, these SF-278s will be placed on the Internet for any foreign government or group to access without disclosing their identity or purpose and with no notice to the employees or their agencies. We should not hand on a silver platter to foreign intelligence services information that could be used to compromise or harass career public servants who have access to the most sensitive information held by the U.S. government.

Section 11 could also jeopardize the safety and security of other executive branch officials, such as federal prosecutors and others who are tracking down and bringing to justice domestic organized crime gangs and foreign terrorists. Crime gangs could easily target the families of prosecutors with substantial assets or debts for physical attacks or threats.

Doc. No. 3-2 at 3–4.

Plaintiffs are primarily an assemblage of associations whose members include the

affected class of senior executive officials. Other Plaintiffs, in contrast, sue on their own behalf.

Plaintiffs name two entities as Defendants: (1) the United States; and (2) Don W. Fox, Acting

Director of the OGE. As Plaintiffs sue Mr. Fox in his official capacity, the Court refers to him

and the United States collectively as "the United States" or "the Government."

On August 2, 2012, Plaintiffs lodged their Complaint. Compl., Doc. No. 1. The thrust of Plaintiffs' Complaint was that the Act's disclosure requirements would compromise their confidential financial information and jeopardize their personal security. Four claims arose from these allegations: (1) violation of the constitutional right to privacy; (2) violation of due process; (3) violation of the APA; and (4) a derivative claim for declaratory relief.

Contemporaneously with their Complaint, Plaintiffs filed a Motion for Preliminary Injunction. Pls.' Mot. Prelim. Inj. (Mot. Prelim. Inj.), Doc. No. 3. The Motion for Preliminary Injunction expanded on the Complaint's themes and called on the Court to issue a preliminary injunction enjoining the United States from "(1) implementing any portion of Section 11 of the [Act], and (2) requiring employees to submit financial disclosure information so long as such information is subject to Internet publication by federal agencies." Mot. Prelim. Inj. 1, Doc. No. 3.

When Plaintiffs initiated the instant lawsuit, the Act's contested disclosure provisions were scheduled to take effect on August 31, 2012. On August 17, 2012, however, the United States filed a Notice to the Court relaying that President Obama had signed into law S. 3510, delaying until September 30, 2012 the implementation of the at-issue provisions. Not. Ct., Doc. No. 13.

As the United States acknowledges,

The congressional record for S. 3510 indicates that this postponement was occasioned by Congress's desire to "address[] the concerns raised [in a letter] by 14 of the most highly respected folks in the national security field, from Michael Chertoff to Mike McConnell to Michael Mukasey, all of whom wrote with serious concerns about the application of one provision of the STOCK Act requiring

online posting of financial data which would potentially impact the national

security and the personal safety of national security and law enforcement

professionals and their families."

Mot. Dismiss 20–21, Doc. No. 39-1 (alteration in original) (quoting 158 Cong. Rec. S5952 (daily

ed. Aug. 2, 2012) (statement of Sen. Mitch McConnell)).

Plaintiffs filed a Motion for Temporary Preliminary Injunction on August 27, 2012. Pls.'

Mot. Temp. Prelim. Inj., Doc. No. 19. The Motion for Temporary Preliminary Injunction was

essentially a version of Plaintiffs' Motion for Preliminary Injunction that focused on the

necessity and equity of issuing a quick ruling in light of Congress's (1) postponement of section

11's effective date until September 30 and (2) its apparent indication that it planned to further

postpone section 11's effective date. *See* Mem. Op., Doc. No. 26 at 5–7.

On September 13, 2012, the Court issued a Memorandum Opinion and Order (Sep. 13

Opinion) granting Plaintiffs' Motion for Temporary Preliminary Injunction. *Id.* The Court held

that Plaintiffs had shown a likelihood of success on the merits and enjoined the implementation

of section 11 until October 31, 2012. The Court reasoned that the constitutional right to privacy

protected the financial information at issue and that the United States had failed to identify

compelling interests sufficient to outweigh Plaintiffs' interests in the privacy of their

information. The Court also held that Plaintiffs satisfied the other elements of the test for

preliminary injunctive relief, including a showing of irreparable harm.

On October 18, 2012, Plaintiffs filed a Motion to Extend the Temporary Preliminary

Injunction (Motion to Extend). Mot. Extend Temp. Prelim. Inj., Doc. No. 37. In their Motion to

Extend, Plaintiffs noted that Congress, again citing safety concerns, delayed the effective date of

section 11(a)(1) to December 8, 2012. S. 3625, 112th Cong. (2012). These concerns prompted

Congress to require the Director of the Office of Personnel Management to contract with the National Academy of Public Administration (National Academy) to study the security issues that section 11 raises and to issue a report containing findings and recommendations thereon. S. 3625, 112th Cong. § 2(a) (2012). Because Congress required the National Academy to submit its study by March 28, 2013, Plaintiffs moved the Court to extend the temporary preliminary injunction to at least May 31, 2013. Mot. Ext. Temp. Prelim. Inj. 4, Doc. No. 37.

A day later, the United States filed a Motion to Dismiss. Mot. Dismiss, Doc. No. 39. In response, Plaintiffs filed an Amended Complaint on November 13, 2012. Am. Compl., Doc. No. 46. In turn, the United States filed a Motion to Dismiss the Amended Complaint. Mot. Dismiss Am. Compl., Doc. No. 50.

On December 5, 2012, Plaintiffs filed a Renewed Motion for a Preliminary Injunction. Renewed Mot. Prelim. Inj., Doc. No. 53. Plaintiffs filed this Motion because the United States suggested during a telephonic status conference that Plaintiffs' filing of the Amended Complaint mooted their Motion for Preliminary Injunction. Likewise, Plaintiffs filed a Renewed Motion to Extend the Temporary Preliminary Injunction. Renewed Mot. Ext. Temp. Prelim. Inj., Doc. No. 54.

On December 7, 2012, Plaintiffs filed a Status Report informing that President Obama had signed into law a bill once more postponing section 11's effective date, this time until April 15, 2013. Status Rep., Doc. No. 56; *see also* H.R. 6634, 112th Cong. (2012). On the same day, Plaintiffs filed a Motion to Stay. Mot. Stay, Doc. No. 58. Also on the same day, the Court issued a Memorandum Opinion and Order (Dec. 7 Opinion) that disposed of various motions related to sealing. As a result, the Court directed Plaintiffs to file a Second Amended Complaint containing the names of certain Doe Plaintiffs and the addresses of all Plaintiffs except the Doe Plaintiffs.

Still on December 7, 2012, the Court issued a separate cleanup Order in which it granted Plaintiffs' Notice of Withdraw of the Motions for Preliminary Injunction (Doc. Nos. 3, 53) and their Motions to Extend the Temporary Preliminary Injunction (Doc. Nos. 37, 54). Doc. No. 62. Plaintiffs withdrew these Motions in light of the latest postponement of section 11's effective date. In the cleanup Order, the Court also denied as moot the United States' Motion to Dismiss (Doc. No. 39) because Plaintiffs' Amended Complaint mooted it. Furthermore, the Court indicated that it would decide the United States' Motion to Dismiss the Amended Complaint on the merits when it ripened.

The Parties proposed a briefing schedule on the Government's Motion to Dismiss the Amended Complaint and the Court approved it. Consistent with the Court's Dec. 7 Opinion, Plaintiffs filed a Second Amended Complaint. Sec. Am. Compl., Doc. No. 67. The United States alleges that the Second Amended Complaint makes substantive changes to the Amended Complaint even though the Court's Dec. 7 Opinion did not call for such changes.[1] Briefing on the United States' Motion to Dismiss the Amended Complaint is complete.

## II.     STANDARD OF REVIEW

### A.     Subject Matter Jurisdiction

"There are two critically different ways in which to present a motion to dismiss for lack of subject matter jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). "First, it may be contended that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* Where the defendant contends that the complaint fails to allege facts sufficient to establish subject matter jurisdiction, "all the facts alleged in the complaint are

---

[1] The Court generally agrees with the United States on this point and will confine its analysis to the Amended Complaint. The Court will also order Plaintiffs to file a Revised Second Amended Complaint in which they make only the changes to the Complaint that the Court's Dec. 7 Opinion and this Opinion contemplate.

assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he

would receive under a Rule 12(b)(6) consideration." *Id.* [2] "Second, it may be contended that the

jurisdictional allegations of the complaint [are] not true." *Adams*, 697 F.2d at 1219. In such

cases, "the court is free to consider exhibits outside the pleadings to resolve factual disputes

concerning jurisdiction." *Zander v. United States*, 843 F. Supp. 2d 598, 603 (D. Md. 2012)

(internal quotation marks omitted) (citing *Smith Wash. Metro. Area Transit Auth.*, 290 F.3d 201,

205 (4th Cir. 2002)).

**B.      Motion to Dismiss**

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the plaintiff's

complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In two recent

cases, the U.S. Supreme Court has clarified the standard applicable to Rule 12(b)(6) motions.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

These cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of

entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). This

showing must consist of at least "enough facts to state a claim to relief that is plausible on its

face." *Id.* at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine

which pleadings are entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1949–50. "When

there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In so doing,

the court must construe all factual allegations in the light most favorable to the plaintiff. *See*

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court

---

[2] This is essentially the case here. The Commission does not dispute the Complaint's central factual allegations.

need not, however, accept unsupported legal allegations, *Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III.   LEGAL ANALYSIS

The United States moves to dismiss all four counts of the Amended Complaint. The Court considers the viability of each count in succession, inserting a section in which it addresses the United States' standing challenges.

## A.   Right to Privacy

The Court carefully analyzed Plaintiffs' right to privacy claim in its Sep. 13 Opinion. The Court need not say considerably more than it already has regarding the viability *vel non* of this claim. The Fourth Circuit established more than two decades ago that the right to privacy reaches sensitive financial information. *See Walls v. City of Petersburg*, 895 F.2d 188, 194 (4th Cir. 1990). Furthermore, as explained in the Sep. 13 Opinion, the United States has failed to identify interests that outweigh Plaintiffs' interests in the privacy of their sensitive financial information. Although the arguments that the United States makes in its Motion to Dismiss the Amended Complaint are not without force, they are ultimately unconvincing. Therefore, to a measureable degree, the Court restates the analysis from its Sep. 13 Opinion in the ensuing space.

The Supreme Court has recognized a right to privacy "in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599–601 (1977). Following in the Supreme Court's footsteps, the Fourth Circuit has long recognized a right to privacy in personal information. *See Taylor v. Best*, 746 F.2d 220, 225 (4th Cir. 1984) (citations omitted). The constitutional right to

privacy protects "[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality." *Walls*, 895 F.2d at 192. Generally, "[t]he more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id.* (citing *Fraternal Order of Police, Lodge 5 v. City of Philadelphia*, 812 F.2d 105, 112–13 (3d Cir. 1987)). Although there is no clear-cut way to determine the extent to which information is intimate or personal, the Fourth Circuit has established that "[f]inancial information . . . is protected by a right to privacy." *Walls*, 895 F.2d at 194 (citation omitted).

A balancing test applies when courts must determine whether government action violates the constitutional right to privacy. *See id.* at 192 (citations omitted); *Best*, 746 F.2d at 225 (citations omitted). When the plaintiff's privacy interests receive constitutional protection, "the defendant has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192 (citations omitted).

However heavy this burden, it is not insurmountable. *See id.* at 194. Governments have a compelling interest in "deterring corruption and conflicts of interests." *Id.* (citation and internal quotation marks omitted). Moreover, when weighing the competing interests of the government and the affected individual, courts must consider the rigor of "any precautions to prevent unwarranted disclosure." *Id.* (citations omitted). Generally speaking, the sufficiency of such measures correlates inversely with the magnitude of the individual's privacy interests.

The right to informational privacy assumes added importance in the Information Age. "[T]he gathering and almost instantaneous transmission of vast amounts of information" marks the Information Age. *Information age*, Dictionary.com, http://dictionary.reference.com/browse/information+age (last visited Mar. 19, 2013). All else equal, these technological innovations increase the likelihood that the publication of personal

information will injure those to whom the information pertains. *Cf. Whalen*, 429 U.S. at 605

(citations omitted) ("We are not unaware of the threat to privacy implicit in the accumulation of

vast amounts of personal information in computerized data banks . . . ."); *Walls*, 895 F.2d at

194–95 ("[I]n a complex society, we need to be ever diligent to guard against misuse [of

personal information].").

Judged against these principles, Plaintiffs have stated a facially plausible right to privacy

claim. The Act prescribes the publication of sensitive financial information. This information

generally includes the disclosure of assets, income, liabilities, and financial transactions,

including securities transactions of a certain amount. Under the authority of *Walls*, this

"[f]inancial information . . .  is protected by a right to privacy." 895 F.2d at 194 (citation

omitted).

That the EGA already mandates the disclosure of such data does not change this

conclusion. As outlined above, section 11 of the Act directly and indirectly erodes key EGA

safeguards to disclosure.

Take section 105(b)(2) of the EGA. This provision prohibits government actors from

making reports available

> to any person . . . except upon a written application by such person
> stating—
> > (A) that person's name, occupation, and address;
> > (B) the name and address of any other person or organization on
> whose behalf the inspection or copy is requested; and
> > (C) that such person is aware of the prohibitions on the obtaining
> or use of the report.

5 U.S.C. app. 4 § 105(b)(2). Beyond burdening requesters with these barriers, Form 201s state

unlawful uses of Form 278s and impress upon requesters that, along with remedies available

under statutory or common law, the Attorney General may bring a civil action against persons who obtain or use Form 278s for improper purposes.

Abandoning this relatively transparent application process, the Act ushers in a scheme of unfettered Internet access to the same sensitive information. The Act obligates the president to publish financial disclosure forms filed under the EGA on the official websites of certain executive branch agencies. This prescription applies to financial disclosure forms that senior executives file in the calendar year 2012, as well as in subsequent years. *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting). For the calendar year of 2012, Plaintiffs estimate—and the United States does not appear to dispute—that section 11 subjects the financial forms of nearly 28,000 executive branch employees to Internet publication. Moreover, section 11 subjects forms filed in subsequent years to Internet publication within thirty days of their filing.

These figures contrast starkly with federal estimates of the number of employees whose financial data the EGA's scheme subjected to disclosure. In 2009, the OGE estimated that an average of 450 Form 201s would be "filed throughout the executive branch each year by members of the public . . . during the period 2010 through 2012." Proposed Collection; Comment Request for an Unmodified OGE Form 201 Ethics Act Access Form, 74 Fed. Reg. 59185, 59186 (Nov. 17, 2009). Publishing the private financial information of nearly 28,000 employees—which risks recurring on an annual basis—dwarfs the privacy loss associated with the submission of 450 or so Form 201s.

This is particularly true because the Act contemplates the publication of droves of discreet fiscal data on the Internet, including through a searchable database. The right to informational privacy assumes added importance in the realm of cyberspace due to the gathering and almost instantaneous transmission of vast amounts of information. For better or worse, the

Information Age has drastically increased the availability and transferability of compromising information; it behooves courts to consider this phenomenon in response to requests to shield sensitive data. *Cf. Whalen*, 429 U.S. at 605 (citations omitted); *Walls*, 895 F.2d at 194–95.

Although the Act requires a login for downloading data contained in the reports, no such requirement attaches to viewing, searching, and sorting data contained in them. *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting). Thus, the login requirement for downloading data creates an illusion of security. Moreover, the login requirement does not apply to those reports whose Internet publication the Act prescribes before the database launches. *Id.* One cannot escape the conclusion that the EGA's transparent and layered application process would deter would-be wrongdoers more than the virtual anonymity the Act commands. *See generally* Harry Surden, Essay, *Structural Rights in Privacy*, 60 SMU L. Rev. 1605 (2007) (discussing the relationship between "latent structural constraints" and privacy expectations).

These are just some of the concerns animating the letter that the group of senior law enforcement, diplomatic, and national security officials submitted to congressional leaders, which the Amended Complaint incorporates by reference. To reiterate, they contend:

> Placing complete personal financial information of all senior officials on the Internet would be a jackpot for enemies of the United States intent on finding security vulnerabilities they can exploit. . . . Posting this detailed financial information on the Internet will jeopardize the safety of executive branch officials . . . and their families who are posted or travel in dangerous areas. . . . Embassy and military security officers already advise these officials to post no personal identifying information on the Internet. . . . Equally important, the detailed personal financial information . . . contained in the SF-278s of senior officials is precisely the information that foreign intelligence services and other adversaries spend billions of dollars every years to uncover . . . . We should not hand on a silver platter to foreign intelligence services information that could be used to compromise or harass career public servants who have access to the most sensitive information held by the U.S. government.

Doc. No. 3-2 at 3–4.

To be sure, their views are not unassailable. However, they warrant respect inasmuch as they have, at least in part, swayed Congress to revisit the wisdom of the Act.

The United States argues that Plaintiffs lack a reasonable expectation of privacy in the contents of Forms 278s for various reasons. The United States contends that the former regime subjected the contents of Form 278s to disclosure. The United States also asserts that Form 278s were subject to online posting before the passage of the Act. Furthermore, the United States notes that Form 278s state that they may "be disclosed upon request to any requesting person pursuant to section 105 of the [EGA] or as otherwise authorized by law." The United States argues that the language "as otherwise authorized by law" notifies filers that one could disclose their information pursuant to sources other than section 105 of the EGA, thereby vitiating any reasonable expectation of privacy.

The United States' arguments are unavailing. As illustrated above, the EGA erected several barriers to the availability of the information that Form 278s contain. Even as it increases the amount of information subject to disclosure, the Act erodes these barriers and, in the process, subjects said sensitive information to diffuse disclosure. Furthermore, the Government has identified no more than a handful of Form 278s that had been posted online prior to the Act's passage. These Form 278s apply to the president, vice president, and federal judges, not the affected class of senior executives. Moreover, outside of the Act, the United States has identified no primary authority mandating online posting of Form 278s. And while the forms apparently state that one may disclose them "as otherwise authorized by law," this statement is vague and would not notice a reasonable person that one could plaster their sensitive contents across cyberspace.

In sum, the degree of disclosure under the Act's scheme is so much greater than that which prevailed under the old regime that it amounts to a difference in kind. This is particularly true given the security concerns that universal disclosure threatens, as Congress has tacitly recognized. Therefore, under the unique confluence of circumstances this case presents, Plaintiffs have demonstrated a reasonable expectation of privacy in their sensitive financial information.

Thus, the crux of the matter is whether the United States has presented interests sufficient to outweigh Plaintiffs' privacy interests. As the *Walls* court held, one cannot gainsay the Government's interest in deterring corruption and conflicts of interests. According to its preamble, this is the Act's cardinal purpose. *See* STOCK Act, Pub L. No. 112-105, 126 Stat. 291 (2012) (announcing that the Act aims to "prohibit Members of Congress and employees of Congress from using nonpublic information derived from their official positions for personal benefit, and for other purposes").

However compelling, these interests fail to outweigh Plaintiffs' privacy and security interests. As elucidated earlier, the financial information the Act subjects to disclosure is quite sensitive. The data's publication portends substantial harm seeing that it stands to affect such a large swath of senior executives. The vehicle of disclosure, cyberspace, exacerbates these risks because it optimizes the accessibility and transferability of the information. Moreover, the Act applies to many military, law enforcement, and diplomatic positions. As the senior security officials' letter highlights, these positions may be acutely vulnerable to the misuse of such financial information.

The United States responds that the Act furthers other interests. They are: (1) increasing public confidence in government; (2) demonstrating the high level of integrity of the vast

majority of government officials; (3) deterring individuals who should not enter public service from doing so; and (4) enabling the public to judge the performance of public officials. *See Duplantier v. United States*, 606 F.2d 654, 669–71 (5th Cir. 1979). However, the United States describes these interests at such a high level of generality as to compromise their substantive force. Furthermore, the United States has failed to identify legislative history substantiating the contention that these interests animated the Act's passage. And even if the abovementioned interests animated the EGA and, by extension, the Act, *Duplantier* is a noncontrolling 1979 case addressing whether EGA provisions requiring judges to file annual financial reports violated their right to privacy. *See* 606 F.2d at 669–71. By contrast, this case involves senior executives, and the EGA's disclosure regime did not mandate unabated Internet access like the Act does. *See id.* at 658–59. Accordingly, the countervailing interests the United States identifies are inadequate to counterbalance Plaintiffs' privacy and security interests.

The United States also argues that Plaintiffs have overstated the degree to which the Act erodes the privacy protections under the EGA's disclosure regime. The United States highlights a handful of EGA provisions purporting to prove that, despite the Act's passage, the OGE will retain authority to regulate public access to Form 278s. For instance, the United States notes that the EGA still makes it unlawful to use reports for certain purposes and that the Attorney General may still bring a civil action against people who obtain or use reports in violation of these provisions. *See* 5 U.S.C. app. 4 § 105(c). Additionally, the United States asserts that the OGE will retain all of its statutory authority to regulate public access to Form 278s, thereby implying that the OGE will adopt measures to safeguard Plaintiffs' delicate data.

These arguments are unpersuasive. Although the EGA still makes unlawful certain uses of Form 278s and the Attorney General may commence civil actions against violators, the Act

abandons the EGA's open and layered application process. Furthermore, although the OGE may retain some authority to regulate access to Form 278s, this authority obviously does not encompass failing or refusing to implement the Act's mandatory Internet disclosure provisions. It is improvident to permit the diffuse dissemination of droves of delicate fiscal data raising serious security concerns based on speculation that the OGE might take measures to mitigate the damage that such broadcasting betokens.

The United States could respond that the OGE's recent notice requesting expedited emergency clearance for an Internet access request form (Form 201-A) demonstrates its willingness to take meaningful mitigatory measures. Ostensibly, the OGE intends for Form 201-A's to operate as obstacles to the access of Form 278s. Form 201-A's "would collect the following information from any requesting person seeking access to such reports: the person's name and the person's city, state and country of residence." Request to Inspect or Receive Electronic Copies of Executive Branch Personnel Public Financial Disclosure Reports, including Periodic Transaction Reports, filed on or after January 1, 2012, 77 Fed. Reg. 66075 (proposed Nov. 1, 2012).

This stopgap compares unfavorably to the constraints on access to Form 278s that prevailed under the old regime. This proposal appears to create an illusion of security because, at least on its face, it entails no means of authenticating the information that the user submits. Furthermore, the Court cannot guarantee that this proposed rule will take effect or that, if it does, it will remain in place. Indeed, as explained in Part I, the OGE has already announced a regulatory change that would appear to render certain Privacy Act provisions inapplicable to the Internet publication of Form 278s. *See* Privacy Act of 1974; Amendment to System of Records,

77 Fed. Reg. 45353 (July 31, 2012). Considering the serious privacy and security considerations at stake, one must tread cautiously over these fissures in the underlying regulatory landscape.

The United States lobs two more major arguments to buttress its contention that Plaintiffs' privacy interests warrant no constitutional protection. One, the United States maintains that Plaintiffs have mounted a facial challenge to the Act and have failed to carry the onerous burden of showing that there is no set of circumstances under which the Act would be constitutional. Second, the United States more or less avers that *Walls* has been overturned.

Both of these arguments lack merit. The contention that Plaintiffs have mounted a facial attack on the Act misses the mark. Plaintiffs have made clear that they do not contest the constitutionality of section 11 in all its applications. For instance, Plaintiffs do not represent top executive officials such as the president, vice president, cabinet secretaries, and other top executives whom the president nominates and the Senate confirms. Although Plaintiffs do not explicitly make these allegations in the Amended Complaint, Plaintiffs' other filings clarify this ambiguity. *Cf. Pegram v. Herdrich*, 530 U.S. 211, 230 & n.10 (2000) (stating that courts may consult parties' legal memoranda to clarify the meaning of ambiguous complaints).

The notion that *Walls* has been overturned is mistaken. The United States relies on the following cases for this proposition: *Ferguson v. City of Charleston*, 186 F.3d 469 (4th Cir. 1999), *rev'd on other grounds*, 532 U.S. 67 (2001); *Condon v. Reno*, 155 F.3d 453, 464 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 141 (2000). *Ferguson*, however, acknowledges that a balancing test applies where "a constitutional right of privacy attaches to personal information." 186 F.3d at 482 (citation and internal quotation marks omitted). *Condon*, for its part, considered whether automobile owners had a reasonable expectation of privacy in the names, addresses, and phone numbers contained in their motor vehicle records. *See* 155 F.3d at 464. Therefore, one can

readily distinguish *Condon* on its facts. Moreover, even if *Ferguson* and *Condon* were directly inconsistent with *Walls*, the latter decision would control under the prior panel rule. *See McMellon v. United States*, 387 F.3d 329, 332–34 (4th Cir. 2004). Accordingly, *Walls* has not been overturned.

For these reasons, the Court denies the United States' Motion to Dismiss as to Plaintiffs' right to privacy claim.

**B.      Standing**

It is axiomatic that federal courts are courts of limited jurisdiction. Article III, section 2 of the U.S. Constitution embodies a central limitation on federal courts' jurisdiction. Pertinently, Article III, section 2 provides that federal courts' jurisdiction extends only to "cases" and "controversies."  *See* U.S. Const. art. III, § 2. Despite functioning to limit federal courts' jurisdiction, the concepts of cases and controversies are inherently expansive. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Courts have endeavored to elucidate the meaning of these twin terms even as they remain mindful of the judiciary's proper role in the scheme of separation of powers. These delicate jurisprudential efforts have given birth to the doctrine of standing. *Cf.* 13A Charles Alan Wright et al., Federal Practice & Procedure § 3531 (3d ed. 2008).

Standing refers to "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary 1536 (9th ed. 2009). Ordinarily, courts invoke standing "to refuse to determine the merits of a legal claim, on the ground that . . . the litigant advancing it is not properly situated to be entitled to its judicial determination." Wright et al., *supra* § 3531, at 1–2. The Supreme Court has issued multitudinous opinions pertaining to standing. *Lujan* represents the Supreme Court's most polished and parsimonious distillation of the principles that

21

these holdings embody. *Cf.* Wright et al., *supra* § 3531.2, at 118. The *Lujan* Court held that standing entails three essential elements: (1) injury in fact; (2) causal connection between the injury and challenged conduct; and (3) reasonable likelihood that a favorable decision will redress the injury. 504 U.S. at 560–61. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561 (citations omitted).

One could characterize the injury-in-fact requirement as a first among equals. *Cf.* Wright et al., *supra* § 3531.4, at 138–39. The Supreme Court has tendered various formulations of this requirement. Before *Lujan*, one could find the Supreme Court's most ubiquitous expression of injury in fact in *Baker v. Carr*, 369 U.S. 186, 204 (1962). The *Baker* Court wrote that standing obligates plaintiffs to "allege[] such a personal stake in the outcome of the controversy as to assure [] concrete adverseness." 369 U.S. at 204. *Lujan*'s definition of injury in fact mirrors *Baker*'s. The *Lujan* Court defined injury in fact as the invasion of a legally protected interest that is "concrete and particularized." 504 U.S. at 560. In turn, the Court defined particularized as injury that "affect[s] the plaintiff in a personal and individual way." *Id.* n.1.

It is well-established that an organization may have standing to sue on behalf of its members. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977) (citing cases). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343.

The burden of showing standing at the pleading stage is not overwhelming. *See Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). In assessing standing, courts must assume that the merits of a dispute will be resolved in favor of the party invoking

jurisdiction and presume that general allegations embrace those specific facts necessary to support the claim. *Id.* (citation and quotation marks omitted). Likewise, the Supreme Court has counseled that  the application of the constitutional standing requirement is not a mechanical exercise and that, when standing is attacked at the motion to dismiss stage, courts must accept as true all material allegations of the complaint and construe it in favor of the plaintiff. *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (citations and quotation marks omitted); *see also Kensington Physical Therapy, Inc. v. Jackson Therapy Partners, LLC*, 880 F. Supp. 2d 689, 692 (D. Md. 2012) (internal quotation marks omitted) (citing *Lujan*, 504 U.S. at 561) ("[E]ach element of standing must be supported with the manner and degree of evidence required at the successive stages of the litigation . . . .").

In this case, with the minor exception noted below, Plaintiffs have satisfactorily shown standing. The United States attacks Plaintiffs' standing on multiple grounds. First, the United States rehashes the idea that the information at issue is already public and that section 11's Internet publication prescription thus threatens no harm. The Court rejects this argument for the reasons stated in Part III.A, *supra*. Second, the United States maintains that Plaintiffs' complained-of injuries are speculative. Similar to argument (1), however, this argument presupposes that the constitutional right to privacy does not attach to the personal information at issue. Argument (2) also downplays Congress's tacit recognition that the Act poses security risks. In related fashion, the United States contends that Plaintiffs' alleged harms do not support standing because third parties would inflict the harm. Again, this argument is oblivious to the damage that the diffuse disclosure of Plaintiffs' discreet pecuniary data does. Furthermore, at least in select cases, a party can show standing where a third party would carry out the alleged harm. *See Pye v. U.S.*, 269 F.3d 459, 470–71 (4th Cir. 2001) (holding that one could fairly trace

alleged harm to government's conduct where government's road improvement risked increased probability of looting and destruction of cohesion).

Argument (4) relates to the "as applied" nature of Plaintiffs' right to privacy claim. The Government contends that as applied challenges require "an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." Defs.' Reply Supp. Mot. Dismiss Am. Compl. 5, Doc. No. 71 (internal quotation marks omitted) (citing *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174–75 (2d Cir. 2006)). Based on this contention, the Government concludes that the Organizational Plaintiffs lack standing. In the Government's estimation, organizational standing is incompatible with the alleged requirement that courts make an individualized determination of the organizational members' claims. The Government cites no controlling authority to support this argument. Argument (4) fails because, in at least two cases, the Fourth Circuit has considered "as applied" challenges where plaintiffs had established organizational standing. *See generally Equity In Athletics*, 639 F.3d 91; *Adkins v. Rumsfeld*, 464 F.3d 456 (4th Cir. 2006).

It is unclear whether the United States argues that the Organizational Plaintiffs otherwise lack standing. If it does, the argument fails as to all the Organizational Plaintiffs save Assembly of Scientists. In the Amended Complaint, Plaintiffs allege as follows:

> Assembly of Scientists, an organization of 45 U.S. scientists, the mission of which
> is to provide a community for those who wish to seek fundamental knowledge
> about the nature and behavior of the universe at any scale, and to apply that
> knowledge to enhance the quality of life, including improving health, lengthening
> life, and reducing the burdens of illness and disability.

Am. Compl. ¶ 8, Doc. No. 46.

These allegations bear no sensible relationship to the issues in this case or the harm that Plaintiffs filed suit to thwart. Although Plaintiffs' Revised Amended Complaint may contain allegations sufficient to establish a threshold showing of standing, such allegations are not properly before the Court. Accordingly, the Court will grant the United States' Motion to Dismiss the Amended Complaint as to its argument that Plaintiff Assembly of Scientists lacks standing. This decision does not prejudice the right of Plaintiffs to file a Revised Second Amended Complaint clarifying the factual bases supporting the standing of Plaintiff Assembly of Scientists.

Arguments (5)-(6) challenge the standing of individual Plaintiffs. The United States asserts that Plaintiff Caramanica lacks standing because she alleges that she is one step below the level that would classify her as a senior executive and, therefore, the Act does not apply to her. However, Caramanica alleges that she decided not to seek a senior executive position because she is unwilling to subject herself to Internet publication of her private financial information. While one cannot guarantee that Caramanica would obtain said position, her allegations support a plausible inference of injury in fact. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jackson., Fla.*, 508 U.S. 656, 665–66 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing."). For its part, argument (6) challenges the standing of Plaintiff Logan, whom Plaintiffs sought to add as a Party in their Second Amended Complaint. But the United States first argued that Logan lacked standing in its Reply. Therefore, the Court declines to consider this argument.

*See U.S. SEC v. Pirate Investor LLC*, 580 F.3d 233, 255 n.23 (4th Cir. 2009) (citation omitted)

("Ordinarily we do not consider arguments raised for the first time in a reply brief . . . .");

*Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citations

omitted) ("The ordinary rule in federal courts is that an argument raised for the first time in a

reply brief or memorandum will not be considered."). Moreover, standing would be proper even

if Caramanica or Logan lacked standing because other Plaintiffs have standing. *See Camreta v.

Greene*, 131 S. Ct. 2020, 2034 n.9 (2011); *Rumsfeld v. Forum for Academic and Inst. Rights,

Inc.*, 547 U.S. 47, 53 (2006); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977); *Village

of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

For the foregoing reasons, Plaintiffs have shown that all Plaintiffs listed in the Amended

Complaint have standing except Plaintiff Assembly of Scientists. The Court extends Plaintiffs

leave to file a Revised Second Amended Complaint clarifying the factual basis of Plaintiff

Assembly of Scientists' standing. Plaintiffs may add Logan as a Plaintiff in the Revised Second

Amended Complaint.

## C.   APA

Plaintiffs argue that the Government's planned Internet publication of their financial

information and creation of the searchable database contravenes the APA. Specifically, Plaintiffs

argue that the planned publication is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" and "contrary to constitutional right, power, privilege, or

immunity." *See* 5 U.S.C. § 706(2)(A)–(B). The Government counters that this anticipated action

is neither "action" nor "final agency action" under the APA. The Government also argues that

Plaintiffs' APA challenge is unripe because the searchable database is still being developed and

will not be complete until at least October 2013.

At the outset, the Court agrees that Plaintiffs' claim that the online database violates the APA is unripe. The planned launch of the database is too temporally distant and the database's construction too inchoate to cross the threshold of ripeness. *Cf. Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967) ("[The] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.").

Section 702 of the APA provides that "[a] person suffering legal wrong because of **agency action**, or adversely affected or aggrieved by **agency action** within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (emphases added). Section 702 codifies the longstanding presumption that courts may review agency action. *See Abbott Labs.*, 387 U.S. at 140. In turn, section 704 of the APA provides that "[a]gency action made reviewable by statute and **final agency action** for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added). Thus, "§ 704 limits the APA's non-statutory right of judicial review to final agency action." *See Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*, 313 F.3d 852, 857 (4th Cir. 2002) (citation omitted); *accord, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Accordingly, for agency action to be reviewable under the APA, it must (1) constitute "agency action" and (2) be "final." *Golden and Zimmerman, LLC v. Domenech*, 599 F.3d 426, 431 (4th Cir. 2010).

Albeit broad, the APA's definition of agency action is not all-encompassing. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006). The APA defines agency action as follows: "the whole or a part of an agency rule, order, license, sanction, relief,

or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Courts typically tackle whether given agency action satisfies this definition on a case-by-case basis. *See Pharm. Mfrs. Ass'n v. Kennedy*, 471 F. Supp. 1224, 1227 (D. Md. 1979).

The Government's planned publication of Plaintiffs' financial information fails to fall under the APA's definition of agency action. The Government's anticipated action is not a "rule" because it is not "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law." *See* 5 U.S.C. § 551(4). Although the publication of Plaintiffs' Form 278s implements the Act, it is not a statement regarding the applicability and future effect of the Act. *See id.* Rather, it is a nondiscretionary, ministerial act involving no decision making that the Government must execute in accordance with express statutory mandate. The Government's action is not an "order" because it is not the final disposition of an adjudicatory process. *See id.* § 551(6)–(7).  The publication in question does not constitute "relief" because it does not involve granting a benefit, recognizing a right, or taking some other action beneficial to a person. *See id.* § 551(11). Plaintiffs could argue that the Government's action constitutes a "sanction" inasmuch as it amounts to a "withholding" of the "recognition of a claim [or] right." *See id.* § 551(10)–(11). Howbeit colorable, this argument overlooks the ministerial, mandatory nature of the contemplated conduct. The Act does not—nor could it—authorize the EGA to determine the constitutionality of the Internet publication prescription and leaves no discretion to withhold the publication of the information. Thus, one cannot fairly say that the Government's failure to halt publication amounts to the withholding of a claim or right. Finally, the other elements of the APA's definition of agency action are manifestly inapplicable to the action at issue. *See* 5 U.S.C. § 704(13).

Caselaw bolsters the conclusion that an agency's execution of a nondiscretionary, ministerial action in compliance with an express statutory mandate is not agency action under the APA. The Supreme Court has considered the circumstances under which an agency's failure to act constitutes agency action. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63–64 (2004) (citations omitted); *cf.* 5 U.S.C. § 706(1) (courts may "compel agency action unlawfully withheld or unreasonably delayed"). The *Norton* Court held that "the only agency action that can be compelled under the APA is action legally required." 542 U.S. at 63. Generally, an action is legally required where it is "ministerial or non-discretionary." *See id.* at 64 (citations omitted); *see also, e.g., Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) ("[I]f an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review."). Quite plausibly, the corollary of the rule that an agency's failure to carry out nondiscretionary, ministerial statutory duties supports APA review is that its success in carrying out such duties fails to support APA review. This deduction dovetails with the line of circuit cases proposing that "[p]rocedural statutes . . . do not apply when an agency has no discretion to act or not to act on a given matter." *See Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1302 (11th Cir. 2010) (citing cases). This conclusion also comports with *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004). The *Public Citizen* Court held that, under the NEPA, agency action that is the but-for cause of a harmful effect is not its legally relevant cause where the agency lacks discretion to refrain from taking the action that is the but-for cause of the harmful effect. *See id.* at 770. Here, similarly, the Act mandates that "the President **shall** ensure that financial disclosure forms . . . are made available to the public on the official websites of the respective executive branch agencies." *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting) (emphasis

29

added). Therefore, even though the Government's mandatory, ministerial publication of the forms portends harm, it is not the legally relevant cause of such harm. Accordingly, the Government's planned Internet publication of Plaintiffs' Form 278s does not constitute agency action for APA purposes.[3]

Even if the Government's planned publication of the forms were agency action, it would not be "final." "As a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process." *Id.* at 177–78 (citation and internal quotation marks omitted).  In other words, "it must not be of a merely tentative or interlocutory nature." *Id.* at 178. Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citations and internal quotation marks omitted). To simplify the analysis, even though this case entails no "decision making" on the Government's part, the Court assumes that the contemplated Internet publication of Plaintiffs' data marks the consummation of its decision-making process. Thus, the Court must consider only whether the Government's action is "one by which rights or obligations have been determined, or from which legal consequences will flow."

Plaintiffs' allegations fail to sustain a plausible inference that the Government's action is one by which rights or obligations have been "determined." Although Plaintiffs may have a "right" to keep the information out of cyberspace, the Government's nondiscretionary, ministerial duty to publish the information does not entail a determination of this right. Likewise, while the Government may have an "obligation" to publish the financial forms, congressional mandate, not the Government's nondiscretionary, ministerial action in conformity therewith,

---

[3] Although Plaintiffs' claim that the launch of the searchable database would violate the APA is unripe, it is hard for the Court to discern a principled distinction between such action and the mandatory, ministerial action of publishing Plaintiffs' financial information on the Internet.

determined this obligation. *Cf. Franklin*, 505 U.S. 788, 800 (1992) (President's actions implementing statute may be indistinguishable from agency's action implementing same statute where President's actions are "merely ceremonial or ministerial").

Plaintiffs' allegations also fail to sustain a plausible inference that the Government's action is one from which legal consequences will flow. Congress's passage of the Act, not the Government's ministerial Internet issuance of the financial forms, is the proximate cause of the legal consequences of which Plaintiffs complain. *See Public Citizen*, 541 U.S. at 770. Furthermore, while the Act betokens harm to Plaintiffs' privacy and security interests, an agency's action is not final agency action merely because it betokens harm. *See, e.g.*, *Sierra Club v. Peterson*, 185 F.3d 349, 377 (5th Cir. 1999) (citation omitted) (Because standing and final agency action are separate requirements, allegations of particularized injury and voluminous evidence of individualized harm are not dispositive as to whether jurisdiction exists under the APA). Nor is the Internet issuance at issue a rule, regulation, directive, policy, binding interpretation or some other statement of the applicability and future effect of the law. *Cf.* 5 U.S.C. § 551(4). Rather, it is a perfunctory, purely procedural duty carrying no substantive content. Hence, at least in a specialized sense, legal consequences fail to flow from the Government's duty to disseminate Plaintiffs' Form 278s.

For the foregoing reasons, this Court lacks jurisdiction under the APA to review the Government's contemplated publication of Plaintiffs' fiscal facts. The Government's anticipated action is neither agency action nor final agency action under the APA. Consequently, the Court grants the Government's Motion to Dismiss the Amended Complaint as to Plaintiffs' APA claim.

**D.      Due Process**

Congress passed the Act on April 4, 2012. Plaintiffs argue that the application of section 11 to those senior executives who filed Form 278s in 2012 but before Congress passed the Act would have unlawful retroactive effects. Although Plaintiffs do not clearly allege that they filed their disclosure reports before April 4, 2012, the Court assumes that they have for analytical purposes.[4]

In some cases, retroactive legislation may risk violating the Due Process Clause and other constitutional provisions in which "'the antiretroactivity principle finds expression.'" *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 176 (4th Cir. 2010) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)). However, a statute does not have impermissible retroactive impact merely because it applies in a case arising from conduct antedating its enactment or upsets expectations based in prior law. *See Landgraf*, 511 U.S. at 269.

The Fourth Circuit has enunciated a three-prong test for determining whether a statute has unlawful retroactive effect. *See Ward*, 595 F.3d at 172. "First, a court must 'determine whether [the legislature] has expressly prescribed the statute's proper reach.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). "If so, 'there is no need to resort to judicial default rules,'" and hence, the presumption against retroactivity does not apply. *Id.* (quoting *Landgraf*, 511 U.S. at 280). "If, however, the legislature has not prescribed the statute's reach, a court must move to step two and 'determine whether the new statute would have a retroactive effect' if applied to the case at hand." *Id.* (quoting *Landgraf*, 511 U.S. at 280). "If not, the presumption against retroactivity again has no application, but if it does, the presumption is triggered, and the court

---

[4] Neither Party discusses whether Congress's repeated postponement of the Act's effective date affects the due process calculus.

must then inquire under the third step whether the presumption is overcome with 'clear congressional intent' in favor of retroactivity." *Id.* (quoting *Landgraf*, 511 U.S. at 280).

"The inquiry under the first step focuses on whether the legislature has expressly prescribed the statute's *temporal* reach, not merely its substantive reach." *Id.* at 173 (citing *Martin v. Hadix*, 527 U.S. 343, 353–54 (1999)). Thus, a statute typically does not have impermissible retroactive effect where it clearly delineates the time period to which it applies. *See id.* (citing *Martin*, 527 U.S. at 353–54).

In this case, the Act clearly delineates the time period to which it applies. Section 11(a) of the Act provides as follows:

> Not later than August 31, 2012, or 90 days after the date of enactment of this Act, whichever is later, the President shall ensure that financial disclosure **forms filed** pursuant to title I of the Ethics in Government Act of 1978 (5 U.S.C. App. 101 et seq.), **in calendar year 2012** and in subsequent years, by executive branch employees specified in section 101 of that Act are made available to the public on the official websites of the respective executive branch agencies not later than 30 days after such forms are filed.

*See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting) (emphases added). The Act expressly contemplates the publication of forms filed "in calendar year 2012." The Court must respect this "clear congressional intent." *Cf. Landgraf*, 511 U.S. at 280. And, although the Act imposes considerably greater burdens on the senior executives who filed their forms in 2012 before its passage, a statute does not have unlawful retroactive effect simply because it upsets expectations based on prior law.

Plaintiffs counter that the Act does not clearly delineate the time period to which it applies. Plaintiffs note that the Act requires the Government to publish the forms online "not later than 30 days after such forms are filed." *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting). Plaintiffs argue that it would be impossible to apply this requirement to forms filed before Congress enacted the Act. To support this argument, Plaintiffs suggest that some senior executives filed forms in early 2012. Because thirty days after early 2012 comes well before April 4, 2012, Plaintiffs reason that the language "in calendar year 2012" is ambiguous. Thus, Plaintiffs conclude that the Act does not clearly delineate the time period to which it applies.

The Court disagrees. The Act expressly provides that "[n]ot later than August 31, 2012 . . . the President shall ensure that financial disclosure forms . . . filed . . . in calendar year 2012 and in subsequent years . . . are made available . . . not later than 30 days after such forms are filed." *See* 5 U.S.C. app. 4 § 105 note (Executive Branch Reporting). The most natural reading of this language is that the President must publish forms filed in 2012 before April 4, 2012 (the date of the Act's passage) no later than August 31, 2012. *Cf. id.* This reading respects the Act's explicit reference to forms filed "in calendar year 2012." And because the pre-April 4, 2012 forms were filed more than thirty days before August 31, 2012, it is also faithful to the Act's allotment of up to thirty days to publish forms after their filing. In short, one cannot reconcile Plaintiffs' preferred interpretation (that section 11(a) applies only to forms filed after April 4, 2012) with the Act's explicit mandate that the President publish forms filed "in calendar year 2012."

As the Act clearly delineates the time period to which it applies, its application to forms filed in 2012 before its passage does not violate due process. Accordingly, the Court grants the Government's Motion to Dismiss the Amended Complaint as to Plaintiffs' due process claim.

**E.      Declaratory Judgment**

"[A] federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three essentials are met: (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004) (citations omitted).

Plaintiffs have satisfied these requirements. Demand (1) is discharged because Plaintiffs' delicate financial data dangles on the brink of diffuse dissemination. As for element (2), the Parties do not dispute that the Court has federal question jurisdiction. And there is no suggestion, nor could there be, that the Court has abused its discretion by exercising jurisdiction. Therefore, Plaintiffs have satisfactorily stated a claim for declaratory relief under 28 U.S.C. § 2201.

**IV.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the United States' Motion to Dismiss the Amended Complaint. A separate Order memorializing the Court's rulings follows.

| March 27, 2013 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |